IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel.<br>ELIZABETH A. COOLEY,<br><br>    Plaintiff,<br><br>        v.<br><br>ERMI, LLC f/k/a ERMI, INC., et al.,<br><br>    Defendants. | CIVIL ACTION FILE<br>NO. 1:20-CV-4181-TWT |

**OPINION AND ORDER**

This is an action under the False Claims Act. It is before the Court on the Defendants' Motion to Dismiss [Doc. 49], which is GRANTED in part and DENIED in part for the reasons set forth below.

## I.    Background

In this False Claims Act case, the Relator, Elizabeth Cooley, alleges that her former employer, ERMI, LLC, and its controlling manager, Thomas P. Branch, have defrauded federal healthcare programs of tens of millions of dollars. ERMI manufactures, sells, and leases durable medical equipment ("DME") that is designed to improve range of motion in patients' knees, shoulders, and other joints. (Second Am. Compl. ¶¶ 1, 51-52.) ERMI has been registered as a limited liability company in Delaware since June 2019, although it maintains its corporate headquarters and manufacturing facilities in Atlanta, Georgia. (*Id.* ¶ 44.) The company is solely owned by Branch, who

also now serves as its chief executive officer and principal manager. (*Id.* ¶ 45.) ERMI markets its DME to physicians, physical therapists, and other healthcare professionals as well as patients who are eligible, or potentially eligible, for federal healthcare benefits. (*Id.* ¶¶ 59-60.) Of ERMI's more than $40 million in revenue each year, the "overwhelming majority" comes from the federal government—chiefly Medicare, the Department of Veterans Affairs (the "VA"), and the Department of Labor's Office of Workers' Compensation Programs (the "OWCP"). (*Id.* ¶¶ 95-100.)

Cooley served as ERMI's chief compliance officer ("CCO") from November 2018 until her termination in October 2019. (*Id.* ¶¶ 2, 65.) Her duties in that role included ensuring management and employees followed all applicable state and federal regulations as well as ERMI's Standards of Conduct. (*Id.* ¶ 66.) During the 11 months she worked at ERMI, Cooley repeatedly raised concerns about improper practices that she observed within the business. For example, when an ERMI salesperson offered free DME to a doctor whose patient had been denied insurance coverage, Cooley wrote that the practice needed to "stop immediately" since it could constitute an "illegal inducement." (*Id.*, Ex. H at 2-3.) On or about June 4, 2019, Cooley also advised Branch that he may have referred federally insured patients to ERMI in violation of the Stark Law. (*Id.* ¶ 232.) In response, Branch became "extremely angry" and instructed Cooley to stop looking into the matter. (*Id.*)

2

By August 2019, Cooley learned that ERMI intended to fire her and that Branch was deliberately interfering with her compliance efforts, including her communications with ERMI's regulatory counsel. (*Id.* ¶¶ 237-38, 245-47.) Still, ERMI and Branch agreed to keep Cooley on board through the end of the year. (*Id.* ¶ 242.) In an email to Branch and then-ERMI CEO Mikael Ohman on August 21, 2019, Cooley wrote: "There will be repercussions if I am fired- this is not a threat, it is my professional evaluation and prediction, and my personal indication. . . . I will not go voluntarily or quietly. I will stay, and work hard to fix the problems I was hired to solve." (*Id.*, Ex. I at 2.) From there, Cooley's relationship with Branch and other ERMI executives continued to sour, and she alleges that she was regularly and routinely bullied during meetings, with Branch blaming her compliance concerns on an undiagnosed anxiety disorder. (*Id.* ¶¶ 251-52.) In October 2019, Cooley confided in Ohman that she was considering a whistleblower lawsuit against ERMI. (*Id.* ¶ 253.) Although Ohman initially expressed interest in joining the lawsuit, he soon informed her on October 22, 2019, that her "resignation" was being accelerated and that she would not be allowed to return to the office. (*Id.* ¶ 256.)

Cooley filed this False Claims Act action against ERMI, Branch, and other affiliated companies on October 9, 2020. After the United States declined to intervene, the Complaint was unsealed on July 14, 2021, and the Defendants moved to dismiss for various pleading defects under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6). In response, Cooley filed her First Amended

3

Complaint as a matter of course, which the Defendants again moved to dismiss on substantially the same grounds. This time, the Court granted the motion in part, holding that the First Amended Complaint was an impermissible shotgun pleading, but the Court also gave Cooley one opportunity to correct her pleading errors before dismissing with prejudice. *See United States ex rel. Cooley v. ERMI, LLC*, 2022 WL 1185155, at *5 (N.D. Ga. Apr. 21, 2022). This case now returns before the Court on Cooley's Second Amended Complaint and the Defendants' renewed Motion to Dismiss.

In the Second Amended Complaint, Cooley asserts that the Defendants—now limited to ERMI, Branch, and End Range of Motion Improvement, Inc.—engaged in five schemes to submit fraudulent claims for payment to the government. The first scheme, known as the "16-Week Billing Scheme," alleges that ERMI automatically charges for 16 weeks' use on all DME leased to government payors, even though ERMI's own research shows that its DME is not medically necessary after 10 weeks. (*Id.* ¶¶ 4-7.) The second scheme, or the "Concealment of Best Prices Scheme," is based on ERMI's failure to disclose to the VA and the OWCP that it supplies identical DME to Medicare customers at significantly lower rates. (*Id.* ¶¶ 8-11.) Third, the "Florida Licensing Scheme" accuses ERMI, through End Range of Motion, of operating in Florida either without the required state license or with a fraudulently obtained license. (*Id.* ¶¶ 12-20.) The fourth scheme, known as the "Illegal Kickback Scheme," alleges that ERMI offers free DME and cash to

4

incentivize clinicians to prescribe ERMI DME to federally insured patients, in violation of the Anti-Kickback Statute.[1]  (*Id.* ¶¶ 21-25.) And finally, the "Illegal Self-Referral Scheme" asserts that Branch, a medical doctor, routinely refers his own patients to ERMI despite having a non-exempt financial relationship with the company, in violation of the Stark Law.[2]  (*Id.* ¶¶ 26-31.)

In the course of each scheme, Cooley alleges that the Defendants committed at least one of two False Claims Act violations: (1) presenting false or fraudulent claims for payment under 31 U.S.C. § 3729(a)(1)(A) and/or (2) making false statements that are material to a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B). Cooley also alleges that ERMI and Branch violated the False Claims Act's retaliation provision, 31 U.S.C. § 3730(h), by threatening, harassing, and eventually terminating her after she threatened to bring a whistleblower lawsuit. Once again, the Defendants move to dismiss the Second Amended Complaint in its entirety. Although Cooley has mostly

---

[1] Relevant to this case, the Anti-Kickback Statute forbids knowingly "offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual [for medical services] for which payment may be made in whole or in part under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b).

[2] The Stark Law prohibits a physician from referring patients to an entity with which she has a non-exempt financial relationship if the referred health services are payable by the United States under Medicare. 42 U.S.C. § 1395nn(a)(1)(A); 42 C.F.R. § 411.353(a). In turn, a hospital may not submit a Medicare claim for services rendered pursuant to a prohibited referral. 42 U.S.C. § 1395nn(a)(1)(B); 42 C.F.R. § 411.353(b).

corrected her earlier shotgun pleading errors, the Defendants argue that her fraud allegations are not pled with particularity, as required by Rule 9(b). The Defendants also raise various claim-specific arguments to support dismissal under Rule 12(b)(6). Having been fully briefed by the parties, the Motion to Dismiss is now ripe for review.

## II.   Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, though, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that the plaintiff "receives the benefit of imagination" at the pleading stage). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of his claims and the grounds upon which they

rest. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

## III.   Discussion

In their Motion to Dismiss, the Defendants argue that the Second Amended Complaint fails to state the elements of each fraudulent scheme with particularized facts under Rule 9(b). (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 6-17.) Alternatively, they argue that the Florida Licensing Scheme is not actionable because Cooley's core allegations were public knowledge before she filed this lawsuit. (*Id.* at 18-19.) Next, the Defendants argue that Cooley's retaliation claim should be dismissed because, as pled, she was not engaged in "protected activity" within the meaning of the False Claims Act. (*Id.* at 19-23.) The Defendants' final argument is that the Second Amended Complaint, in treating ERMI and Branch as one in the same, provides no basis to hold Branch individually liable on any claims. (*Id.* at 23-25.) The Court addresses each argument as necessary to resolve the Motion to Dismiss.

### A. Rule 9(b)'s Particularity Requirement

The False Claims Act authorizes a private citizen, acting on behalf of the government, to file a civil action against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(A)-(B). A "claim" includes direct requests for payment to the government as well as reimbursement requests under federal benefits

7

programs. *See Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 182 (2016). "Liability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005). In the healthcare context, a violation often occurs when a person "bill[s] for services not provided or not medically necessary" or "falsely certifies that [she] is in compliance with federal health care laws that are a condition of payment." *United States ex rel. Chase v. HPC Healthcare, Inc.*, 723 F. App'x 783, 788 (11th Cir. 2018). Because an action under the False Claims Act is rooted in fraud, a relator must plead her claims with particularity to survive dismissal under Rule 9(b). *See United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002).

The particularity requirement is satisfied with "facts as to time, place, and substance of the defendant's alleged fraud," including "the details of the defendants [sic] allegedly fraudulent acts, when they occurred, and who engaged in them." *Id.* at 1308 (quotation marks and citation omitted). Since a claim for payment is the *sine qua non* of a False Claims Act violation, the complaint must specifically allege the "'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Corsello*, 428 F.3d at 1014. Rule 9(b) does not permit a relator "merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely

8

submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Rather, "some indicia of reliability must be given in the complaint to support the allegation of *an actual false claim* for payment being made to the Government." *Id.*; *see also Corsello*, 428 F.3d at 1014 ("Underlying improper practices alone are insufficient to state a claim under the False Claims Act absent allegations that a specific fraudulent claim was in fact submitted to the government.").

In the Eleventh Circuit, a relator can meet this heightened pleading standard using one of two approaches. The first is to reference "specific billing information" such as "dates, times, and amounts of actual false claims or copies of bills" that were submitted to the government. *Chase*, 723 F. App'x 789; *see, e.g.*, *United States ex rel. Matheny v. Medco Health Solutions, Inc.*, 671 F.3d 1217, 1227 (11th Cir. 2012) (finding particularized allegations of fraud where the complaint identified the "patient or account number, the Medicare or Medicaid claim invoice number or reimbursement check number, the line item number of the invoice, the [billing] code, the amount of [o]verpayment, and how long the [o]verpayment remained in each patient account."). The second is to allege "direct knowledge of the defendants' submission of false claims based on [the relator's] own experiences and on information she learned in the course of her employment." *Chase*, 723 F. App'x at 789; *see, e.g.*, *United States ex rel. Walker v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005) (declining to dismiss where the relator, a former nurse practitioner with the

9

defendant, allegedly billed her services under a physician's name each day and was told by the office administrator that all nurse practitioners and physician assistants billed in this manner); *Hill v. Morehouse Med. Assocs., Inc.*, 2003 WL 22019936, at *4 (11th Cir. Aug. 15, 2003) (holding that the relator's allegations were reliable since she worked in the defendant's billing department for seven months and observed specific employees and physicians alter billing codes and submit false claims for Medicare reimbursement). Even when a relator professes insider knowledge of a defendant's billing practices and patient records, she is not spared from the requirement to allege a specific factual basis for false claims. *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276 (11th Cir. 2018).

In *Clausen*, for example, the relator alleged that a medical testing company had charged the government for unauthorized, unnecessary, or excessive tests that were conducted on patients at long-term care facilities. *See Clausen*, 290 F.3d at 1303. The relator worked for one of the defendant's competitors, and in his complaint, he referenced conversations with the defendant's employees about its policies and procedures, specific descriptions and technical codes for the improper medical tests, and the testing histories of three representative patients. *See id.* at 1302, 1304. The Eleventh Circuit held that these details did not pass muster under Rule 9(b). Although the relator generally alleged that the defendant had submitted false claims, "[n]o amounts of charges were identified"; "[n]o actual dates were alleged"; "[n]o policies about

billing or even second-hand information about billing practices were described"; and "[n]o copy of a single bill or payment was provided." *Id.* at 1312. In other words, the relator failed to provide information "linking the testing schemes to the submission of any actual claims or any actual charges"; he "d[id] not adequately allege when—or even if—the schemes were brought to fruition." *Id.* at 1312-13.

The same is true here of the Second Amended Complaint. Cooley sets forth (in varying detail) five schemes by which ERMI allegedly charged federal health insurance programs for DME that was unnecessary, overpriced, or tainted by licensing violations, kickbacks, or self-referrals. However, nowhere in the Second Amended Complaint does she point to even one specific example of a false claim by date, amount, claim number, patient, or otherwise. Instead, Cooley alleges that ERMI has received tens of millions of dollars in revenue from Medicare, the VA, and the OWCP since January 2015. (Second Am. Compl. ¶¶ 96-99.) Then, in conclusory fashion, she extrapolates that *every single claim* submitted by ERMI over that period was fraudulent. (*Id.* ¶¶ 263-64, 273-74, 311, 314, 341, 344, 354-56, 368.) To illustrate, she asserts that from January 2015 to July 2019, the United States paid ERMI no less than $61,245,927.75 on claims for 16 weeks of DME use.[3] (*Id.* ¶ 121.) By

_____

[3] As best the Court can tell, this figure was calculated by adding (1) the total claims that were paid by Medicare and the VA to ERMI from January 2015 to December 2018 and (2) the total claims that were paid by the OWCP

11

Cooley's back-of-the-envelope math, at least $22,967,222.91 of that amount (*i.e.*, six weeks' use) was not medically necessary. (*Id.* ¶ 122 & n.37.) But Cooley does not reveal a source or any other factual support for these large sums, contrary to Eleventh Circuit case law. *See United States ex rel. Johnson v. Bethany Hospice & Palliative Care, LLC*, 2020 WL 1542339, at *8 (S.D. Ga. Mar. 31, 2020), *aff'd sub nom. Estate of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496 (11th Cir. 2021). And she may not "rely on mathematical probability to conclude that the [Defendants] surely must have submitted a false claim at some point." *Carrel*, 898 F.3d at 1277. At least in *Clausen*, the relator was able to provide patient identities, testing dates, and testing procedures as examples of probable false claims. *See Clausen*, 290 F.3d at 1315. Cooley has not managed even that small feat.

Still, as Cooley emphasizes in her response brief, "there is no per se rule that a[] [False Claims Act] complaint must provide exact billing data or attach a representative sample claim." (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, at 3 (citation omitted).) It is also possible to show sufficient indicia of reliability by alleging direct, firsthand knowledge or participation in the defendant's fraudulent conduct. In *United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 F. App'x 693, 695-96 (11th Cir. 2014), for example, the relator held senior management positions in a hospital group and its

---

to ERMI from January 2018 to July 2019. (Second Am. Compl. ¶¶ 97-98.)

subsidiary, including CEO of a hospital operated by the subsidiary, before filing suit against them. He alleged that the defendants used payments and gifts to induce ten doctors to refer Medicare patients to the hospital, in violation of the Stark Law and the Anti-Kickback Statute, and that the defendants falsely certified their compliance with these laws in cost reports sent to the government. *See id.* at 697. The complaint, however, did not identify the date or amount of a single Medicare claim that was submitted for a referred patient. *See id.* at 706. Even so, the Eleventh Circuit allowed the case to proceed because the relator articulated how he gained firsthand knowledge of the defendants' false claims. In his management roles, the relator learned about the hospital's revenues and payor mix and became familiar with all Medicare patients and their bills through case management meetings. *See id.* at 708. He also recalled a conversation in which the CEO of the subsidiary's other hospital asked him to split the cost of doctor incentives in exchange for Medicare referrals. *See id.* at 707. Reading the opinion further, the Eleventh Circuit also included an important caveat that may undermine Cooley's reliance on the "insider" pleading approach:

> Critical to this conclusion is also the fact that the type of fraud alleged here does not depend as much on the particularized medical or billing content of any given claim form. In other [False Claims Act] cases, the allegation is that a defendant's Medicare claim contained a false statement because the claim sought reimbursement for particular medical services never rendered to the patient . . . *or for medical services that were unnecessary, overcharged, or miscoded* . . . or for improper prescriptions. *In those types of cases, representative claims with particularized*

13

> *medical and billing content matter more*, because the falsity of
> the claim depends largely on the details contained within the
> claim form—such as the type of medical services rendered, the
> billing code or codes used on the claim form, and what amount
> was charged on the claim form for the medical services.

*Id.* at 708 (emphasis added) (citations omitted). In other words, *Mastej* stands for the proposition that a relator "must satisfy Rule 9(b) with respect to the circumstances of the fraud he alleges—but not as to matters that have no relevance to the fraudulent acts." *Id.*

Here, of course, Cooley does allege in part that the Defendants asked the government to pay for unnecessary or overpriced medical equipment. So, following the Eleventh Circuit's guidance in *Mastej*, it will be more difficult for Cooley to overcome Rule 9(b) since she cannot pinpoint any representative claims for these alleged schemes. With this principle in mind, the Court evaluates whether Cooley's personal knowledge alone carries the indicia of reliability required to survive dismissal.

Starting with the 16-Week Billing Scheme, Cooley asserts that ERMI automatically bills the United States for 16 weeks of DME use even though its DME is not medically necessary beyond 10 weeks. (Second Am. Compl. ¶¶ 112, 118.) In support of this scheme, she alleges that (1) ERMI ignores frequent requests from patients to pick up DME sooner than 16 weeks; (2) ERMI sales representatives advise doctors to write all DME prescriptions for 16 weeks; (3) ERMI ignores prescriptions for less than 16 weeks and bills the United States for 16 weeks; and (4) ERMI's annual budget is based on 16 weeks of

14

revenue for all DME billed to the United States. (*Id.* ¶¶ 110-11, 115-17, 119-20.) Unlike the relator in *Mastej*, nowhere in the Second Amended Complaint does Cooley explain how she came into this knowledge as ERMI's CCO. Although Cooley references an "investigation" in one paragraph, she offers scant details about that investigation or the sources of her findings, whether internal discussions, personal observations, patient records, or something else. (*Id.* ¶ 110.) She is unable to name a single patient whose request to retrieve DME early went unanswered, or a single sales representative who advised writing 16-week prescriptions, or a single doctor whose shorter prescriptions were altered or ignored. This raises serious red flags in the Court's mind: that despite her alleged insight into ERMI's billing practices, Cooley cannot offer precise facts pointing to even one example of a false claim. *See Carrel*, 898 F.3d at 1278 ("[T]hat the relators supposedly had access to pertinent data and still were unable to pinpoint specific false claims . . . suggests that they lack any meaningful personal knowledge or participation in the fraudulent conduct." (quotation marks and citation omitted)); *Estate of Helmly*, 853 F. App'x at 501. Instead, Cooley recounts one conclusory conversation with an ERMI sales director, who allegedly informed her that ERMI bills the United States for 16 weeks no matter the patient's needs. (*Id.* ¶ 109.)

At most, these allegations suggest some suspicious, if not illegal, behavior on ERMI's part, but there is no indication that Cooley has direct

knowledge as to how, when, or even if that behavior translated into the submission of false claims. As described in the Second Amended Complaint, Cooley never observed, much less participated in, the submission of a fraudulent claim; she was not tasked as CCO with overseeing ERMI's billing functions or reviewing individual claims on the government; and she never had conversations with anyone in ERMI's billing department (as opposed to a salesperson) about its billing policies. These missing details distinguish Cooley's case from *Mastej* and others that have found particularized allegations of fraud based on personal knowledge. In *Hill*, for example, the relator was a former employee in the defendant's billing department, and she described in detail the defendant's internal billing practices, who was responsible for altering billing codes, how often false claims were submitted, and what confidential internal documents evidenced the fraud. *See Hill*, 2003 WL 22019936, at *4. Similarly, the relator in *Walker*, a former nurse practitioner with the defendant, alleged that she personally participated in the fraudulent scheme by billing her services under a doctor's name each day. *See Walker*, 433 F.3d at 1360.

This case instead more closely resembles *Carrel*, in which the relators claimed insight into the defendant's standard operating procedures as former managers. *See Carrel*, 898 F.3d at 1270, 1277. According to the relators, they knew (and even witnessed) that the defendant offered incentives to employees and patients to recruit new patients. *See id.* at 1277-78. The defendant's

president allegedly admitted to the incentives, and the relators pointed to an internal financial presentation that listed the defendant's referral figures. *See id.* at 1278. But these referrals at unknown times and places, the Eleventh Circuit observed, were "untethered to any particular transaction or claim that actually involved government funding." *Id.* at 1278. Affirming dismissal, the Eleventh Circuit held that "the relators failed to explain how their access to possibly relevant information translated to knowledge of actual tainted claims presented to the government." *Id.* at 1278. In other words, the relators could not rely on general allegations of "standard operating procedures," "standard business practices," and the "course of operations" to demonstrate that the defendant ever wrongfully demanded payment from the government. *Id.* (citation and alterations omitted).

The same holds true here. Although Cooley may have uncovered some improper practices in ERMI's business, she fails to connect those practices—based on her job duties or some other particularized knowledge or experience—to an actual fraudulent claim that was submitted to the government. Under these circumstances, district courts in this circuit routinely dismiss False Claims Act complaints brought by corporate insiders. *See, e.g.*, *United States ex rel. Aquino v. Univ. of Miami*, 250 F. Supp. 3d 1319, 1333 (S.D. Fla. 2017) (Although the relator had access to doctor and patient records that were forwarded to the defendants' billing department, and she was allegedly told to alter patient data to meet the criteria for Medicare reimbursement, her

17

complaint failed because she "did not have any duties which gave her knowledge of or participation in Defendants' actual submission of Medicare claims or receipt of Medicare payments."); *Johnson*, 2020 WL 1542339, at *10-11 (The relators' "vague and conclusory" discussions about fraudulent claims with the defendant's employees did not provide sufficient indicia of reliability since the conversations "were not had in conjunction with Relators' participation in the fraud."); *United States ex rel. D'Anna v. Lee Memorial Health Sys.*, 2019 WL 1061113, at *7 (M.D. Fla. Mar. 6, 2019) (The relator, a longtime compensation auditor with the defendant, did not plead a pay-for-referral scheme with particularity where no allegations "suggest[ed] that [the relator] ever had access to billing documents or Medicare claims.").

The other schemes outlined in the Second Amended Complaint suffer from the same kind of pleading defects. Under the Concealment of Best Prices Scheme, Cooley claims that ERMI charges the VA and the OWCP substantially more for certain DME than it does Medicare. Allegedly, Medicare assigned ERMI's knee device PDAC Code E1811 and its shoulder device PDAC Code E1841, but ERMI bills the VA and the OWCP under PDAC Code E1399 for the same equipment—a difference worth thousands of dollars per month. (Second Am. Compl. ¶¶131-32, 137, 141-42.) The sole factual basis for this scheme is a conversation that took place between Cooley and Branch in December 2018. During that conversation, Branch allegedly admitted that ERMI charges the VA and the OWPC higher rates for its DME, declaring that ERMI had "earned

the right" after giving thousands of free units to veterans. (*Id.* ¶¶ 146-47.) But this conversation, standing alone, is not enough to meet Rule 9(b)'s particularity requirement. In *Estate of Helmly*, the relators similarly alleged that five of the defendant's employees had confirmed false claims on the government, but the Eleventh Circuit affirmed dismissal all the same because:

> [E]ven with "direct knowledge of the defendants' billing and patient records," Relators have "failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010). Additionally, Relators did not claim to have observed the submission of an actual false claim; nor did they personally participate in the submission of false claims.

*Estate of Helmly*, 853 F. App'x at 501-02; *see also Carrel*, 898 F.3d at 1278 (That the defendant's president allegedly admitted to referral incentives "at unknown times and places again fails to establish specific instances where the Foundation wrongfully demanded payment from the government."). Cooley has likewise failed to allege basic details concerning the "who," "what," "when," "where," and "how" of the Concealment of Best Prices Scheme, and the fact that she never participated in or observed the submission of incorrectly coded bills seriously undermines her self-proclaimed inside knowledge.

Turning to the Florida Licensing Scheme, Cooley asserts that since 2016, ERMI has been supplying DME to Florida patients either without the proper state license or with a fraudulently obtained license. Because ERMI

must certify compliance with state licensing requirements to maintain Medicare billing privileges, she alleges that "all claims for DME provided to patients in Florida rely on knowingly false records and/or statements." (Second Am. Compl. ¶¶ 17-19.) But again, the Second Amended Complaint lacks particularized facts showing that ERMI submitted any Medicare claims for Florida patients during the relevant time period. On this subject, Cooley generally alleges that "Florida is ERMI's single largest market in terms of both gross revenue and Medicare dollars" and that "[a]pproximately 20 percent of Florida's population is over the age of 65." (*Id.* ¶ 12.) In essence, Cooley is attempting to "rely on mathematical probability to conclude that [ERMI] surely must have submitted a false claim at some point." *Carrel*, 898 F.3d at 1277. However, "[s]peculation that false claims must have been submitted is insufficient." *Id.* (quotation marks and citation omitted). Even if "a defendant bills the government for some or most of its services, the burden remains on a relator alleging the submission of a false claim to allege specific details about false claims to establish the indicia of reliability necessary under Rule 9(b)." *Estate of Helmly*, 853 F. App'x at 502 (quotation marks and citation omitted). Cooley plainly cannot carry that burden with conclusory allegations about ERMI's revenue in Florida at unspecified times.

Next, Cooley alleges in the Illegal Kickback Scheme that ERMI salespeople routinely offer free DME and cash as an incentive for clinicians to prescribe its DME to federally insured patients. The Second Amended

Complaint accuses two specific employees of arranging the kickbacks. (Second Am. Compl. ¶ 223.) The first, Marc Cortez, was allegedly fired in December 2018 after it was discovered that he paid workers' compensation attorneys to refer patients to ERMI. (*Id.* ¶ 213.) The other, Brad Caire, was a sales representative in New Orleans who allegedly convinced up to 12 physicians to prescribe ERMI DME to all of their patients. (*Id.* ¶ 215.) When Cooley asked Caire to prove the medical necessity of these prescriptions, he resigned from ERMI. (*Id.* ¶ 216.) In neither instance does Cooley even attempt to connect Cortez's or Caire's alleged solicitations to the submission of a claim to the government. At bottom, there is no suggestion that any attorney or doctor who received an incentive in fact referred a patient with federal health insurance to ERMI.[4] And there is no suggestion that ERMI in fact sought payment from the government as a result of an illegal kickback. Nor does Cooley plead the kickbacks themselves with particularity: she does not identify who received the referral incentives, which patients were improperly referred, what form

---

[4] Though not cited in the Second Amended Complaint as an example of an illegal kickback, the same is true of ERMI sales representative Gaby Saliba's conduct. On June 14, 2019, Saliba was asked via email why ERMI DME was being set up for a patient whose insurance had denied coverage. (Second Am. Compl. ¶ 204.) She responded: "We told the [doctor] we would take care of this patient whether it was approved or denied." (*Id.* ¶ 205.) But in the attached email chain, Saliba never states that the purpose of the free DME was to induce the doctor to prescribe ERMI DME to federally insured patients. Nor does Cooley allege that the doctor ever did prescribe ERMI DME to federally insured patients after this incident.

the incentives took (*i.e.*, Cortez made unspecified "payments," and Caire is not alleged to have paid anything to anyone), or when the exchanges took place. *See Chase*, 723 F. App'x at 790; *Mastej*, 591 F. App'x at 705. Accordingly, this scheme also comes up short under Rule 9(b).

The fifth and final scheme—the Illegal Self-Referral Scheme—contains the most vague and conclusory allegations of all. Cooley asserts that Branch and other providers in his practice "routinely" refer federal healthcare recipients to ERMI, in violation of the Stark Law. (Second Am. Compl. ¶¶ 229-30.) Then, ERMI and Branch allegedly "routinely" present claims to federal health insurance programs, including Medicare, the VA, and the OWCP, for DME furnished to self-referred patients. (*Id.* ¶ 231.) When Cooley brought up these possible Stark Law violations to Branch in June 2019, he allegedly became "extremely angry" and instructed Cooley not to investigate the matter further. (*Id.* ¶ 232.) Curiously, even though Cooley describes this as a "routine" practice, she offers no specific facts (*e.g.*, patient names, dates or frequency, dollar amounts, or claim numbers) to corroborate that Branch referred any of his patients to ERMI or that self-referrals resulted in any ERMI claims on the government. Nor does she allege that she participated in or witnessed the submission of claims for self-referred patients. In sum, for this and the other four alleged schemes, Cooley has failed to demonstrate an actual fraudulent claim with the particularized facts demanded by Rule 9(b). The Court thus concludes that Cooley cannot pursue any fraud-based claims under

the False Claims Act, and the Motion to Dismiss should be granted as to Counts I through VIII.

## B. Retaliation Against Cooley

The False Claims Act also creates a private right of action for a person who is "'discriminated against in the terms and conditions of her employment' for engaging in protected activity." *Chase*, 723 F. App'x at 791 (quoting 31 U.S.C. § 3730(h)(1)) (brackets omitted). To establish a prima facie case of retaliation, a plaintiff must allege three essential elements: "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." [5] *Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota L.P.*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022). Protected activity, as defined in the statute, includes either "[1] lawful acts done by the employee . . . in furtherance of an action under [the False Claims Act] or [2] other efforts to stop 1 or more violations of [the False Claims Act]." 31 U.S.C. § 3730(h)(1). The second category of protected activity was only added in 2010 by congressional amendment. *See Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1288 (11th Cir. 2021). Now, the retaliation provision

---

[5] Because a retaliation claim under the False Claims Act does not turn on allegations of fraud, it is subject only to the notice pleading standard of Rule 8(a). *See Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008).

extends coverage to "at least some set of people who make 'efforts to stop' False Claims Act violations," even if those efforts are not taken in furtherance of a False Claims Act lawsuit. *Id.*

Prior to the amendment, the Eleventh Circuit interpreted § 3730(h) to protect "an employee from retaliation when there was at least 'a distinct possibility' of litigation under the False Claims Act at the time of the employee's actions." *Sanchez*, 596 F.3d at 1303 (citation omitted). The Eleventh Circuit has since acknowledged that the scope of protected activity is broader post-amendment, but it has not adopted a test for what constitutes other efforts to stop a False Claims Act violation. *See Hickman*, 985 F.3d at 1288. Some circuit courts, for their part, have endorsed an "objective reasonableness" standard: that is, the plaintiff's conduct is protected when "'it is motivated by an objectively reasonable belief that the employer is violating, or soon will violate,' the False Claims Act." *Hickman*, 985 F.3d at 1288 (quoting *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 201 (4th Cir. 2018)). Twice, the Eleventh Circuit has "assume[d] without deciding that this is the applicable standard," where the district court used, and the parties did not dispute, the objective reasonableness approach. *Simon*, 2022 WL 3910607, at *6; *see also Hickman*, 985 F.3d at 1288-89. Here, though, the parties applied only the longstanding "distinct possibility" standard to Cooley's retaliation allegations. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 19; Relator's Br. in Opp'n to Defs.' Mot. to Dismiss, at 18-19.) Because the Eleventh Circuit has

24

not definitively adopted another test for protected activity, the Court will follow the parties' lead and do the same.

The distinct possibility standard asks whether "an employee's actions, as alleged in the complaint, are sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee[.]" *Sanchez*, 596 F.3d at 1304. If the answer is "yes," then the complaint states a claim for retaliatory treatment under § 3730(h). *See id.* This inquiry generally raises related but distinct issues such as causation and notice. Namely, the False Claims Act imposes liability for retaliation only if the plaintiff suffered discrimination "because of" her participation in protected activity. 31 U.S.C. § 3730(h)(1); *see also Nesbitt v. Candler Cnty.*, 945 F.3d 1355, 1359 (11th Cir. 2020) (endorsing a but-for causation standard for retaliation claims under the False Claims Act). And to establish such a causal connection, the plaintiff must show that her employer "was at least aware of the protected activity" at the time of the adverse employment action. *Chase*, 723 F. App'x at 792; *see also Mack v. Augusta-Richmond Cnty., Ga.*, 148 F. App'x 894, 897 (11th Cir. 2005) ("For the [employer] to have acted in a retaliatory manner, it follows that they must have been aware of and acted as a result of [the employee's] allegedly protected conduct.").

The Defendants argue that Cooley's alleged conduct in the course of her employment did not provide notice of her intent to file a False Claims Act

lawsuit. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 20-23.) As the Defendants point out, Cooley's primary function as ERMI's COO was to ensure that management and employees abided by government regulations and internal corporate policies. (Second Am. Compl. ¶ 66.) Under these circumstances, where a plaintiff's job duties include regulatory compliance and investigating potential fraud, there is a higher burden to plead protected activity. *See Mack*, 148 F. App'x at 897; *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 568 (6th Cir. 2003). Allegations that a compliance officer was "just doing h[er] job," *United States v. KForce Gov't Sols., Inc.*, 2014 WL 5823460, at *11 (M.D. Fla. Nov. 10, 2014), or was "attempting to make her employers comply with the rules," *Brunson v. Narrows Health & Wellness LLC*, 2008 WL 11422063, at *7 (N.D. Ala. Mar. 31, 2008), will not suffice. Rather, "such persons must make clear their intentions of bringing or assisting in a[] [False Claims Act] action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." *Yuhasz*, 341 F.3d at 568 (quotation marks and citation omitted); *see also Mack*, 148 F. App'x at 897 ("Where an employee's job responsibilities involve overseeing government billings or payments . . . . such an employee can put his employer on notice by any action which, regardless of his job duties, would put the employer on notice that [False Claims Act] litigation is a reasonable possibility." (quotation marks, citation, and alterations omitted)).

Cooley alleges that on at least two occasions, she voiced concerns about possible regulatory violations at ERMI to senior management, including Branch. The first time occurred in June 2019, when Cooley instructed Ohman and ERMI's sales representatives not to offer clinicians free DME to avoid the appearance of an illegal inducement. (Second Am. Compl. ¶¶ 204-07 & Ex. H.) The second time came in the same month, when Cooley alerted Branch that he may have referred federally insured patients to ERMI despite his financial interest in the company. (*Id.* ¶ 232.) In August 2019, after Cooley learned that ERMI planned to terminate her by the year's end, she wrote in an email to Branch: "There will be repercussions if I am fired- this is not a threat, it is my professional evaluation and prediction, and my personal indication. If you have any doubts here, I should and will explain the ramifications to you." (*Id.*, Ex. I at 3.) Finally, in October 2019, Cooley allegedly confided in Ohman that she was considering filing a whistleblower lawsuit against ERMI. (*Id.* ¶ 253.) Later that month, Ohman informed Cooley that she would be "resigning" ahead of schedule and that she was not allowed to return to the office. (*Id.* ¶¶ 255-56.)

Up until Cooley's October 2019 conversation with Ohman, none of these alleged communications, the Court concludes, put the Defendants on notice that Cooley was engaged in protected activity. Cooley's reports about illegal kickbacks and self-referrals at ERMI did not suggest that she was contemplating or investigating a qui tam action; in fact, as alleged, she never mentioned the possibility of fraud on the government to anyone within ERMI.

27

*See McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 516 (6th Cir. 2000) ("Although internal reporting may constitute protected activity, the internal reports must allege fraud on the government."); *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 740 (D.C. Cir. 1998) ("[A]n employee's investigation of nothing more than his employer's non-compliance with federal or state regulations" is not protected activity. "To be covered by the False Claims Act, the plaintiff's investigation must concern 'false or fraudulent' claims."). Cooley's actions were instead wholly consistent with her job responsibility to oversee regulatory compliance at ERMI. Also, her vague reference to "repercussions" in the event of her termination did not raise the specter of a whistleblower lawsuit. Cooley specifically qualified this statement as a prediction, not a threat, while expressing her desire to "work hard to fix the problems [she] was hired to solve." (Second Am. Compl., Ex. I at 2.)

However, the allegation that Cooley and Ohman, then ERMI's CEO, discussed filing a whistleblower action against ERMI, pushes her retaliation claim over the line. Though not necessary, "[t]hreatening to file a qui tam suit or to make a report to the government . . . clearly is one way to make an employer aware" of protected activity. *Yesudian*, 153 F.3d at 743. Coupled with her earlier complaints about kickbacks and self-referrals, Cooley's stated interest in a whistleblower lawsuit supports "a reasonable conclusion that [ERMI] could have feared being reported to the government for fraud or sued in a *qui tam* action by [Cooley][.]" *Sanchez*, 596 F.3d at 1304.

Recognizing the strength of this allegation, the Defendants urge the Court to disregard it as mere pleading gamesmanship—an implausible, opportunistic effort to avoid a dispositive defense. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 20-22.) As the Defendants underscore, the Ohman conversation was not included in either of Cooley's two prior complaints, and it only appeared in the Second Amended Complaint after the Defendants informed her about the higher pleading burden for compliance officers. (*Id.* at 21-22.) Under this backdrop, the Defendants argue that the Court "need not ignore the prior allegations in determining the *plausibility* of the current pleadings[.]" (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 21 (alteration omitted) (quoting *Fasugbe v. Willms*, 2011 WL 2119128, at *5 (E.D. Cal. May 26, 2011)).) "There is no rational reason," they insist, "why Cooley would not have previously led with her strongest allegations in support of her retaliation claim unless, of course, these things never actually happened." (*Id.* at 22.)

In the Court's view, the authorities relied upon by the Defendants are not applicable in this circuit. Some district courts in the Second and Ninth Circuits have chosen to consider prior allegations where a plaintiff's amended complaint "directly contradicts the facts set forth in his original complaint." *Kant v. Columbia Univ.*, 2010 WL 807442, at *7-8 (S.D.N.Y. Mar. 9, 2010) (quoting *Wallace v. N.Y.C. Dep't of Corr.*, 1996 WL 586797, at *2 (E.D.N.Y. Oct. 9, 1996)); *see also Fasugbe*, 2011 WL 2119128, at *5 (finding the plaintiffs' latest allegations implausible where a webpage screenshot in the original

complaint was altered in the amended complaint). But the Eleventh Circuit has flatly rejected this approach, holding that an amended complaint "supersede[s] the previous complaints and render[s] null their contradictory allegations." *Seiger by & through Seiger v. Philipp*, 735 F. App'x 635, 638 (11th Cir. 2018);[6] *see also Pintando v. Miami-Dade Hous. Agency*, 501 F.3d 1241, 1243 (11th Cir. 2007). In any event, Cooley's alleged conversation with Ohman merely added to and did not contradict the facts in her earlier pleadings. As the Third Circuit observed in *West Run Student Housing Associates, LLC v. Huntington National Bank*, 712 F.3d 165, 172 (3d Cir. 2013), "[p]laintiffs routinely amend complaints to correct factual inadequacies in response to a motion to dismiss." *See also* 6 Wright & Miller, Federal Practice and Procedure § 1474 (3d ed. Apr. 2022 update) ("Perhaps the most common use of Rule 15(a) is by a party seeking to amend in order to cure a defective pleading."). The Court will not punish Cooley for coming forward with additional details of retaliation, just as the Defendants requested, even if the sudden appearance of those details raises eyebrows. Cooley has done enough to at least pursue her

---

[6] The Defendants' reliance on *Fernandez v. School Board of Miami-Dade County*, 201 F. Supp. 3d 1353 (S.D. Fla. 2016), is misplaced following *Sieger*. In *Fernandez*, which was decided almost two years before *Sieger*, the court accepted the facts in the original complaint, not the amended complaint, as true, finding that the plaintiffs had "manipulated the allegations in their pleadings to avoid a dispositive defense." *Fernandez*, 201 F. Supp. 3d at 1361 n.1. But the out-of-circuit authorities cited for this conclusion were plainly rebuffed by *Sieger*. *See id.*

retaliation claim beyond the pleading stage.

Nonetheless, the Court agrees with the Defendants that Branch should be dismissed from this claim. Before Congress amended the retaliation provision in 2009, it expressly applied to adverse employment actions taken "*by [an] employer*," and courts unanimously ruled that this language precluded liability against supervisors in their individual capacities. *See Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743, 747-48 (E.D. Va. 2016) (quoting 31 U.S.C. § 3730(h) (2003)). Now, because the term "employer" no longer appears in § 3730(h), some courts have concluded that Congress intended to expand the class of potential defendants to include a plaintiff's supervisors. *See id.* at 748. "But the overwhelming majority of courts, including the Fifth Circuit, have held that the current version of § 3730(h) does not create a cause of action against supervisors sued in their individual capacities." *Id.* This Court is persuaded by the latter line of cases. As the Fifth Circuit reasoned in *Howell v. Town of Ball*, 827 F.3d 515, 520 (5th Cir. 2016), "it is clear that the reference to an 'employer' was deleted to account for the broadening of the class of [False Claims Act] plaintiffs to include 'contractors' and 'agents,' not to provide liability for individual, non-employer defendants." The Second Amended Complaint does not allege that Branch, in his individual capacity, "employed" Cooley while she was at ERMI; therefore, the Court determines that ERMI alone is the proper defendant on her retaliation claim.

31

### IV.   Conclusion

For the foregoing reasons, the Defendants' Motion to Dismiss [Doc. 49] is GRANTED in part and DENIED in part. Counts I through VIII are dismissed in their entirety, and Count IX is dismissed as to Defendant Thomas P. Branch.

SO ORDERED, this ____30th____ day of September, 2022.

*Thomas W. Thrash*

THOMAS W. THRASH, JR.
United States District Judge