## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel. ELIZABETH A. COOLEY,** | **CASE NO. 1:20-cv-04181-TWT** |
| **Plaintiff** | |
| **v.** | |
| **ERMI, LLC f/k/a ERMI, INC.; THOMAS P. BRANCH, M.D.; and END RANGE OF MOTION IMPROVEMENT, INC.** | **FALSE CLAIMS ACT, 31 U.S.C. §§ 3729,** *ET SEQ.***, ACTION** |
| **Defendants.** | |
| | **JURY TRIAL DEMANDED** |

## THIRD AMENDED COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, *ET SEQ.*

COMES NOW Plaintiff/Relator Elizabeth A. Cooley, by and through the undersigned counsel, and files this Third Amended Complaint Pursuant to the False Claims Act, 31 U.S.C. §§ 3729, *et seq.* (hereinafter "TAC"), and alleges as follows:

TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................1

   A. Overview of Scheme No. 1 – Over Billing for 16 Weeks of Usage. ..............2

   B. Overview of Scheme No. 2 – Failure to Disclose "Best Prices" to VA and OWCP. ........................................................................................3

   C. Overview of Scheme No. 3 – Illegal Activity in Florida. ..............................4

II. PARTIES, JURISDICTION, AND VENUE ................................................5

III. FACTS COMMON TO ALL COUNTS.....................................................7

   A. Defendant ERMI LLC, Defendant Branch, and Relator. ..............................7

   B. Federal Health Care and Insurance Programs. ............................................14

      1.  Medicare....................................................................................14

      2.  The Federal Employees' Compensation Act. ........................................18

      3.  Veterans' Administration Benefits. ......................................................19

      4.  ERMI Relies on the Federal Government for the Majority of its Revenue. ........................................................................................20

IV. SCHEME SPECIFIC FACTUAL ALLEGATIONS .......................................22

   A. Scheme 1: Sixteen Week Billing Scheme. ..................................................22

      1.  Relator Initiates "Denials Management" Investigation. ........................23

        (a) Claims Denied Due to Clerical Errors. ..............................................27

        (b) Global Payments Denials. ..............................................................27

        (c) Medical Necessity Denials. ............................................................28

2.  Relator's Recommendations Fall on Deaf Ears..................................30

3.  Relator Learns that Performing "Medical Necessity" Checks will Jeopardize ERMI's "16-Week Program" Billing Scheme. ..................31

4.  Relator Discovers ERMI's Internal Documents Cannot Support "Medical Necessity" for 16 Weeks.........................................................................33

5.  Audit of Physician Signatures................................................................36

6.  ERMI Leadership Confirms its "16-Week Program."..........................37

7.  ERMI Shops Its "16-Week Program" to Potential Investors. ..............38

8.  ERMI's Efforts to Obtain Capital Infusion Fail. ................................42

B.  Relator's Personal Knowledge of ERMI's Financial Reports. ...................43

C.  Scheme 1: Sixteen Week Billing Scheme—Make-or-Use. ........................50

D.  Scheme 2: Concealment of Best Prices.......................................................54

1.  Number of Claims Submitted, Amounts Charged, Amounts Paid, and Average Price per Payor. ......................................................................54

2.  ERMI Knowingly Charges Unreasonable and Excessive Rates for DME Provided to VA and OWCP Patients. ....................................................56

(a) ERMI PDAC Prices and Codes. ........................................................58

(b) Relator Confronts ERMI Leadership Regarding Unreasonable and Excessive Rates During December 2018 Leadership Meeting. .......62

E.  Scheme 3: Activity in Florida. ....................................................................65

1.  Florida Licensure Requirement. ...........................................................71

2.  ERMI's Operations within Florida. ......................................................73

3.  ERMI's Unlicensed Activities in Florida. ............................................75

iii

4.    Fraudulent License Periods....................................................................79

F.  Branch and ERMI Retaliate Against Relator for Trying to Do Her Job......85

COUNT I - VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A), "PRESENTMENT" FALSE CLAIMS BY DEFENDANTS BRANCH AND ERMI ..................90

(Scheme 1: Sixteen Week Billing Program) ......................................................90

COUNT II – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY DEFENDANTS ERMI AND BRANCH ...........................................................................92

(Scheme 1: Sixteen Week Billing Program) ......................................................92

COUNT III – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A), "PRESENTMENT" FALSE CLAIMS BY DEFENDANTS ERMI AND BRANCH ..................96

(Scheme 2: Concealment of "Best Prices")........................................................96

COUNT IV – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE CERTIFICATIONS BY ERMI AND BRANCH ........................101

(Scheme 2: Concealment of "Best Prices")......................................................101

COUNT V – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY ERMI AND BRANCH .......................................................................................................103

(Scheme 3: Unlicensed Activity in Florida).....................................................103

COUNT VI – VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY ERMI AND BRANCH .......................................................................................................108

(Scheme 3: Fraudulent Activity in Florida) .....................................................108

COUNT VII – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(H), RETALIATION BY ERMI AND BRANCH ....................................................................116

iv

(Retaliation against Cooley) ............................................................116

IX. JURY TRIAL DEMANDED ..........................................................117

## I.    INTRODUCTION

1.    Defendant ERMI manufactures and leases durable medical equipment (DME) that assists orthopedic patients regain range of motion.  The allegations set forth herein relate to a series of longstanding and systemic schemes by ERMI and its controlling manager, Thomas P. Branch, M.D., to defraud the United States.  As a matter of course, Defendants overbill the United States tens of millions of dollars on an annual basis.  They brazenly ignore Federal Regulations and applicable state law licensing requirements.  Defendants knowingly and willfully ignore the enrollment requirements for Department of Health and Human Services and the United States Department of Labor providers.  Defendants' combined schemes and resulting false claims to Federal health care and insurance programs have resulted in tens of millions in losses to the United States.

2.    Relator Elizabeth Cooley ("Relator" or "Cooley") served as ERMI's Chief Compliance Officer from November of 2018 to October of 2019.  As Chief Compliance Officer, Cooley's duties included reviewing relevant policies and procedures for sales and billing practices and ensuring management and employees complied with all State and Federal rules and regulations related thereto.  Cooley regularly met with Branch and other ERMI executives as well as ERMI's national and regional sales managers.

1

3.      The facts alleged herein are based on Cooley's experiences as Chief Compliance officer at ERMI and information Cooley learned through her personal review of records in the normal course of her duties as Chief Compliance Officer, her participation in meetings and discussions with Branch, ERMI executives, and others identified herein.

A.      **Overview of Scheme No. 1 – Over Billing for 16 Weeks of Usage.**

4.      ERMI's internal research shows that patients reach maximum medical improvement, *i.e*., regain full range of motion, from using its DME within the first 10 weeks.  ERMI, however, automatically bills the Federal Government for 16 weeks as a matter of course.

5.      ERMI's budget is based on the assumption that it will receive the maximum payment for 16 weeks for every device leased to a government payor.

6.      Scheme 1 is, therefore, based on ERMI's conscious decision to bill the United States for 16 weeks of DME usage, notwithstanding the fact that ERMI knows that its DME is no longer medically necessary after at most 10 weeks.

7.      Accordingly, *every single bill* submitted by ERMI to the United States for 16 weeks of usage contains no less than six (6) weeks of charges for usage beyond the time during which its DME is medically necessary.

2

**B.     Overview of Scheme No. 2 – Failure to Disclose "Best Prices" to VA and OWCP.**

8.     Medicare pays ERMI $150.95 per month for patients who use its Knee Flexionater and $509.84 per month for patients who use its Shoulder Flexionater. ERMI has also entered into a GSA contract to supply DME to patients insured by the Department of Veterans Affairs (the "VA") and the Department of Labor, Office of Workers' Compensation Programs ("OWCP").

9.     ERMI knowingly failed to disclose to the VA and OWCP that it offers identical products to Medicare customers at significantly lower prices.  For example, ERMI negotiated monthly prices for its Knee Flexionater of $2,310.00 with the VA and $6,900.00 with the OWCP, greatly above the $150.95 per month paid by Medicare.  As a result, each month, ERMI overbills the VA by $2,159.05 and the OWCP by $3,299.05 per Knee Flexionater.  Similarly, ERMI bills the VA $2,310.00 and the OWCP $6,900.00 per month for the Shoulder Flexionater compared to just $509.84 per month for Medicare.  ERMI, therefore, overbills the VA $1,800.16 and the OWCP $6,390.16 per month for each Shoulder Flexionater.

10.     ERMI knowingly failed to disclose previously assigned codes and rates with intent to defraud the VA and OWCP into paying significantly higher rates for the same DME.

3

11. *Every single bill* submitted by ERMI to the VA and the OWCP was done so with the knowledge that the amounts charged therein were unreasonable and excessive and that the VA and OWCP agreed to such rates without knowledge previously assigned billing codes and rates.

### C. Overview of Scheme No. 3 – Illegal Activity in Florida.

12. Florida is ERMI's single largest market in terms of both gross revenue and Medicare dollars. Approximately 20 percent of Florida's population is over the age of 65. To protect the health and safety of Florida residents, DME providers must undergo rigorous licensing requirements in order to be licensed by Florida before supplying DME to Florida residents.

13. Prior to October 13, 2016, ERMI knowingly provided DME to patients in Florida without the requisite Florida license.

14. Between October 13, 2016 and October 12, 2018, ERMI provided DME to patients in Florida pursuant to a fraudulently obtained license.

15. Between October 13, 2018 and November 1, 2019, ERMI again knowingly provided DME to patients in Florida without the requisite state license.

16. Between November 1, 2019 and the filing of this action, ERMI provided DME to patients in Florida pursuant to a second fraudulently obtained license.

4

17.    Pursuant to 42 C.F.R. § 424.516, ERMI must certify (and recertify) compliance with certain requirements to maintain its CMS billing privileges.  These certifications include, among other things, that ERMI is in compliance with all applicable Federal and State licensure, certification, and regulatory requirements. *See*, 42 C.F.R. § 424.516(a)(2).

18.    Because ERMI knowingly operated in Florida either without a license or with a fraudulently obtained license, it certified falsely that it was in compliance with all applicable Federal and State licensure, certification, and regulatory requirements.

19.    As such, ERMI has never operated in Florida pursuant to a properly issued license and, as a result, all claims for DME provided to patients in Florida rely on knowingly false records and/or statements.

20.     As such, *every single claim* paid by the United States to ERMI for DME and related services provided to patients in Florida is based on a false record or statement in violation of 31 U.S.C. § 3729(a)(1)(B).

## II.    PARTIES, JURISDICTION, AND VENUE

21.    Defendant ERMI is a Delaware limited liability company authorized to conduct business in the State of Georgia.  ERMI's operations are headquartered at 2872 Woodcock Road, Atlanta, Fulton County, Georgia 30341 and its principal

place of business is located at 441 Armour Place, N.E., Fulton County, Atlanta, Georgia 30324.  ERMI has accepted service and consents to the jurisdiction of and venue in this Court.

22.    Defendant Thomas P. Branch, M.D. ("Branch") is an individual resident of the State of Georgia with his principal residence located at 930 Lullwater Road, N.E., Atlanta, Georgia 30307.  Branch has accepted service and consents to the jurisdiction of and venue in this Court.

23.    On March 29, 2019, the Georgia Secretary of State issued a Certificate of Conversion whereby ERMI ("ERMI, Inc.") was converted from a Georgia corporation to a Delaware limited liability company ("ERMI LLC").

24.    From June 22, 2016 to June 4, 2019, ERMI was authorized to transact business in Florida as a foreign (Georgia) corporation doing business as End Range of Motion Improvement, Inc.  Since June 4, 2019, ERMI has been authorized to transact business in Florida as a foreign (Delaware) limited liability company doing business as End Range of Motion Improvement, LLC.

25.    ERMI, Inc., End Range of Motion Inc., ERMI, LLC, and End Range of Motion Improvement LLC" are in fact the same entity.

6

26.    End Range of Motion Improvement, Inc. ("End Range of Motion") is named as a defendant herein, has accepted service, and consents to the jurisdiction of and venue in this Court.

27.    Plaintiff/Relator Elizabeth A. Cooley ("Relator") is a resident of Newton County, Georgia and brings this action on behalf of the United States of America and herself.

28.    Relator brings this action in the name of the United States based upon direct and unique information obtained by her during her period of employment as Chief Compliance Officer for Defendant ERMI and is an "original source" of the material information set forth herein.

29.    Relator has made appropriate voluntary disclosures to the United States prior to the filing of this action as required by 31 U.S.C. § 3730(b)(2).

30.    Jurisdiction and venue are proper in this Court.

### III.    FACTS COMMON TO ALL COUNTS

### A.    Defendant ERMI LLC, Defendant Branch, and Relator.

31.    Defendant Branch originally formed ERMI in 1992 as a Georgia for-profit corporation.

32.    In June 2019, ERMI converted to a Delaware limited liability company. ERMI's headquarters and manufacturing facilities are nonetheless still located in Fulton County, Georgia.

33.    Branch is currently ERMI's Chief Executive Officer and principal manager.  Branch, through a series of related entities owned by him, is the sole beneficial owner of ERMI's membership interests.

34.    Although ERMI has an executive team, Branch is the ultimate decision maker and, as such, exercises complete control over ERMI.

35.    Branch personally approves ERMI's annual budget and budget assumptions.

36.    Branch personally negotiates the rates ERMI charges for its DME, including the rates ERMI charges the United States through various Federal health care and insurance programs.

37.    All actions of ERMI and End Range of Motion were performed at the direction of Branch with Branch's full knowledge and consent and for the personal financial benefit of Branch who is the ultimate majority owner of ERMI and its related and affiliated entities.

38.    Branch treats ERMI and its related entities as his personal "piggy bank," using corporate funds to pay for and maintain his personal lifestyle.

39.    ERMI manufactures, sells, and leases DME designed to assist orthopedic patients regain range of motion.

40.    ERMI DME includes orthopedic devices for the knee, shoulder, elbow, and "great toe."[1]

41.    Each type of ERMI DME generally falls into one of two categories: (a) "Flexionater" or (b) "Extensionater."

42.    The "Flexionater" helps restore flexion, or bending of the joint, while the "Extenionater" works on regaining "extension," or straightening the joint.

43.    While most of the devices offered by ERMI's competitors facilitate movement in one direction, ERMI's Shoulder Flexionater (shown below) helps restore movement in multiple directions, albeit in just one direction at a time, including external rotation, abduction, flexion, and internal rotation.

---

[1] *See* https://www.ermi-motion.com/programs/.



44.    ERMI's Knee Flexionater (shown below) applies a high intensity stretch to the knee nearly equal to the intensity delivered by a physical therapist.



---

[2] https://www.ermi-motion.com/program/shoulder/.
[3] https://www.ermi-motion.com/program/knee/.

45.    The claims at issue in this case center around ERMI's Knee Flexionater (hereinafter "Knee Device") and Shoulder Flexionater (hereinafter "Shoulder Device"). The Knee Device and Shoulder Device are collectively referred to as ERMI's "DME."

46.    ERMI manufacturers its DME at its facility located at 441 Armour Place, N.E., Atlanta, Georgia 30324.

47.    ERMI markets its DME and related support services to third-party payors, physicians, physical and occupational therapists, nurse case managers, and other healthcare professionals.

48.    ERMI also markets its DME to patients eligible, or potentially eligible, for Federal health care program benefits, workers' compensation benefits, and VA benefits.

49.    ERMI promotes its DME and support services as the ERMI "Program."

50.    ERMI's internal research shows that the average patient using its Knee devices requires an "average of 44 days of treatment."[4]

51.    ERMI's internal research shows further that the average patient using its Shoulder devices requires an "average of 48 days of treatment."[5]

---

[4] *See*, 8.5-Final-Solutions-Brochure (the "ERMI Program") attached hereto as **Exhibit A** at Ex. A-6.
[5] Ex. A-8.

52.     A published, peer-reviewed systematic review of three studies in which ERMI's Knee Device was used found that only one (1) of 110 patients was followed for up to 16 weeks.[6]

53.     Relator was hired as ERMI's Chief Compliance Officer in November 2018.

54.     As Chief Compliance Officer, Relator Cooley's duties included ensuring management and employees comply with all applicable state and federal rules and regulations as well as the company's purported Standards of Conduct.  In furtherance of these duties, Relator was required to review ERMI's billing policies, procedures, and practices as well as audit claims and invoices submitted to payors, including the United States.

55.     In Relator's role as Chief Compliance Officer, she gained first-hand knowledge of ERMI's internal medical research.

56.     Relator's responsibilities as Chief Compliance Officer also required her to ensure that ERMI and its employees, including herself, complied with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

---

[6] *See*, Aspinall, Sara K. *et al*., *Medical stretching devices are effective in the treatment of knee arthrofibrosis: A systematic review*, JOURNAL OF ORTHOPAEDIC TRANSLATION 27 (2021) 119-131 attached hereto as **Exhibit B** at Ex. F-7.

57.     Although Relator Cooley attended law school, she voluntarily surrendered her law license more than 10 years ago (at the request of her then current corporate employer) to make sure that the health care workers with whom she engaged would not have any grounds to argue that anything they told her was covered by the attorney client privilege.   Cooley is not licensed to practice law in any state or country and she has never represented ERMI as its legal counsel or held herself out as ERMI's legal counsel.[7]   Accordingly, neither Relator Cooley's conversations with Branch, ERMI executives, and/or ERMI employees nor any of the facts alleged herein are subject to attorney-client privilege.

---

[7] *See*, Declaration of Relator Cooley filed in response to ERMI's Motion to Quash in the matter of *In re: Elizabeth Cooley Subpoena* in Civil Action File No. 1:20-mi-0069-TWT-LTW attached hereto as **Exhibit C**; *see also*, Amended Declaration of Relator Cooley attached hereto as **Exhibit D**.

13

B.    <u>**Federal Health Care and Insurance Programs.**</u>[8]

      1.    **Medicare.**

58.    Medicare is a federal health insurance program for individuals who are 65 or older.  Medicare also covers certain younger individuals with disabilities and end-stage renal disease.[9]

59.    Medicare Part B (Medical Insurance) covers certain doctor services, outpatient care, medical supplies, and preventive services.

60.    The Medicare program is administered by the Centers for Medicare & Medicaid Services (CMS), which is part of the United States Department of Health and Human Services (HHS).

61.    Pursuant to 42 C.F.R. § 414.202, "Durable Medical Equipment," or "DME," is defined as equipment, furnished by a supplier or a home health agency that (1) can withstand repeated use, (2) has an expected life of at least three years, (3) is primarily and customarily used to serve a medical purpose, (5) is not generally

---

[8] 42 U.S.C. § 1320a-7b(f)(1) defines "Federal health care program" as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part by the United State Government (other than the health insurance program under chapter 89 of Title 5 [i.e., health insurance for federal employees])."

[9] See https://www.medicare.gov/what-medicare-covers/your-medicare-coverage-choices/whats-medicare.

useful to an individual in the absence of an illness or injury, and (6) is appropriate for in-home use.

62.    ERMI's devices are DME for purposes of the Medicare program.

63.    ERMI's Knee and Shoulder Devices are DME covered by Medicare.

64.    ERMI is an "Accredited" "DMEPOS supplier" in accordance with the requirements set forth in 42 C.F.R. § 424.58.

65.    To be eligible to receive payment for Medicare-covered items as an "Accredited DMEPOS supplier," ERMI was required to (a) submit a completed application for Medicare billing privileges to CMS, including all required enrollment forms; (b) enroll separately all physical locations (other than those used solely as warehouses or to make repairs) from which it furnishes Medicare-covered DMEPOS; and (c) furnish CMS will all information or documentation required to process the claim.[10]

66.    As part of ERMI's application for Medicare billing privileges, ERMI was required to make certain certifications including, but not limited to, the following: (a) its business operations comply with all applicable laws and regulatory requirements and that it will continue to conduct its business operations in

---

[10] *See* 42 C.F.R. § 424.57(b)(1) and (5).

accordance with all such applicable laws and regulatory requirements;[11] (b) it is licensed to provide Medicare-covered DMEPOS and related services in all states requiring such licensure and that it will continue to maintain said licenses in all states requiring such licensure;[12] (c) it has not made, or caused to be made, any false statements or misrepresentations of material fact in its application;[13] (d) it will report to CMS any changes in the information supplied within thirty (30) days of the change;[14] (e) it is responsible for delivering Medicare-covered DMEPOS to patients and that it maintains proof of delivery;[15] (f) it is in compliance with, and will continue to comply with, the ownership and controlling interest disclosure provisions in 42 C.F.R. § 420.206;[16] (g) it will notify its accreditation organization each time it opens a new DMEPOS location;[17] (h) all of its locations meet and will continue to meet the DMEPOS quality standards;[18] and (i) it maintains and that it will continue to maintain all ordering and referring documentation in accordance with the provisions in 42 C.F.R. § 424.516(f).[19]

---

[11] *See* 42 C.F.R. § 424.57(c)(1)(i).
[12] *See* 42 C.F.R. § 424.57(c)(1)(ii)(A).
[13] *See* 42 C.F.R. § 424.57(c)(2).
[14] *See* 42 C.F.R. § 424.57(c)(2).
[15] *See* 42 C.F.R. § 424.57(c)(12).
[16] *See* 42 C.F.R. § 424.57(c)(17).
[17] *See* 42 C.F.R. § 424.57(c)(23).
[18] *See* 42 C.F.R. § 424.57(c)(24).
[19] *See* 42 C.F.R. § 424.57(c)(28).

67.    Accordingly, Medicare requires all DME suppliers applying for Medicare Part B billing privileges to certify that they are in compliance with all state and federal rules and regulations and that they will continue to comply with all such rules and regulations.  This includes certifying that they have obtained all applicable state licenses and that they will maintain all such licenses.[20]

68.    ERMI's failure to meet and continue to meet the standards certified to in its application for Medicare billing privileges will result in the revocation of its Medicare billing privileges.[21]

69.    ERMI must revalidate its application for Medicare billing privileges every (3) years.[22]

70.    As a condition of Medicare Part B's payment for ERMI DME and services, ERMI must (a) maintain the prescription and supporting documentation provided by the physician and make the same available to CMS upon request;[23] and (b) submit additional documentation to CMS upon its request to support and/or substantiate that its DME is medically necessary.[24]

---

[20] 42 C.F.R. § 424.516.

[21] *See* 42 C.F.R. § 424.57(e)(1).

[22] *See* 42 C.F.R. § 424.57(d).

[23] 42 C.F.R. § 410.38(c)(5)(i).

[24] *See* 42 C.F.R. § 410.38(c)(5)(ii).

71.    Medicare Part B only pays claims for equipment that satisfies three (3) requirements: (a) the equipment must satisfy the definition of "DME;" (b) the DME must be necessary and reasonable for the treatment of the patient; and (c) the DME must be used in the patient's home.

72.    Pursuant to 42 U.S.C. § 1395x(n), neither a skilled nursing facility ("SNF") nor a hospital is a patient's home.

73.    If an individual is a patient at either a SNF or a hospital, the individual is not entitled to have separate Medicare Part B payment made for rental or purchase of DME.

74.    Thus, Medicare Part B does not cover and will not pay claims for DME provided to individuals who are patients at either a SNF or a hospital.

**2.    The Federal Employees' Compensation Act.**

75.    The Federal Employees' Compensation Act ("FECA"), 5 U.S.C. §§ 8101 *et seq*., "provides for the payment of workers' compensation benefits to civilian officers and employees of all branches of the Government of the United States."[25]

---

[25] 20 C.F.R. § 10.0.

76.    FECA is administered by the Division of Federal Employees' Compensation ("DFEC") of the Office[26] of Workers' Compensation Programs ("OWCP") of the United States Department of Labor.[27]

77.    FECA provides coverage for "medical services, appliances or supplies" prescribed or recommended by a qualified physician which OWCP considers necessary to treat work-related injuries.[28]

78.    FECA requires all DME providers who enroll with OWCP certify that they satisfy all applicable federal and state licensure and regulatory requirements and that they will maintain documentary evidence of such.[29]

79.    ERMI's DME is covered by FECA as medical services, appliances, or supplies necessary to treat work-related injuries.

### 3.    Veterans' Administration Benefits.

80.    The VA is an executive department of the United States which administers benefits and other services to veterans, their dependents, and their beneficiaries.

---

[26] *See* 38 U.S.C. §§ 301(a).

[27] *See* OWCP Publication CA-810, Injury Compensation for Federal Employees, § 1-3 (Rev. 2009) (OWCP Publication CA-810).

[28] *See* 20 C.F.R. § 10.310(a); see also DFEC PM, FECA Part 3, §§ 3-0300.1 & 3-0400.3c(3).

[29] 20 C.F.R. § 10.800(a).

81.    The VA fills prescriptions for durable medical equipment, prosthetics,

orthotics, and supplies ("DMEPOS")[30]  for covered veterans as part of its medical

benefits package.[31]

82.    ERMI's devices are DMEPOS covered by the VA's medical benefits

package.

83.    The VA medical benefits packages covers "care [that] is needed to

promote, preserve, or restore the health of the individual and is in accord with

generally accepted standards of medical practices."[32]

84.    VA program benefits also cover "durable" "home medical

equipment"[33] "if medically indicated."[34]

### 4.    ERMI Relies on the Federal Government for the Majority of its Revenue.

85.    ERMI generates over $40,000,000.00 in revenue each year and was

recently valued at approximately $130,000,000.00.

---

[30] DMEPOS, as defined by the Code of Federal Regulations, includes durable medical equipment, or "DME."
[31] *See* 38 C.F.R. §§ 17.38(a)(1)(viii) & 17.4025(b)(4).
[32] 38 C.F.R. § 17.38(b).
[33] 38 C.F.R. §§ 17.3210 and 17.3230(a)(vi).  38 C.F.R. § 17.3210 defines "*Home medical equipment*" as "an item that is movable and durable medical device that is used in a home or residential setting to treat or support treatment of specific medical conditions."
[34] 38 U.S.C. § 1717(b).  *See also,* 42 C.F.R. § 414.230(b)(1).

86.    Between January 2015 and July 2019, the United States approved *and paid* **$77,863,253.84** in claims submitted by, at the direction of, and on behalf of ERMI for DME supplied to OWCP, VA, and Medicare patients nationwide:

| | 2015 | 2016 | 2017 | 2018 | 2019-01-2019-07 | Total |
|---|---|---|---|---|---|---|
| **OWCP** | - | - | - | $5,732,760.58 | $2,894,079.23 | **$8,626,839.81** |
| **VA** | $9,673,218.98 | $12,737,446.48 | $14,847,425.19 | $13,280,887.62 | $7,316,432.82 | **$57,855,411.09** |
| **Medicare** | $687,856.60 | $602,393.96 | $432,891.47 | $356,967.64 | $160,717.32 | **$2,240,826.99** |
| **Total:** | **$10,361,075.58** | **$13,339,840.44** | **$15,280,316.66** | **$19,370,615.84** | **$19,511,405.32** | **$77,863,253.84** |

*See*, July 2019 ERMI Financial Operations Review – Cash Summary spreadsheet attached hereto as **Exhibit K**; *see also*, July 2019 ERMI Operations Review – Cash spreadsheet attached hereto as **Exhibit L**.

87.    Relator maintained possession of several of ERMI's financial and operations review reports following her termination.  These reports, however, do not list individual workers' compensation payors separately for the years 2015 through 2017.  Although Relator gained personal knowledge that ERMI did in fact receive payments for claims submitted to the United States for DME provided to OWCP patients during the years 2015 to 2017, the documents listing those amounts separately from all other workers' compensation payors are now in the exclusive possession, custody, and control of ERMI.  Relator, therefore, cannot ascertain the precise amount that the United States paid ERMI for OWCP claims between 2015

and 2017 and, as a result, she has intentionally left these entries blank in the above summary table.

88.    The overwhelming majority of ERMI's revenue comes from Federal health care and insurance programs, including workers' compensation benefits, VA benefit programs, and Medicare.  *See*, Ex. K-1.

89.    According to ERMI, its "program" has been used in over 100,000 cases.

90.    Continued use of DME must be supported by medical necessity.[35]

## IV.    SCHEME SPECIFIC FACTUAL ALLEGATIONS

### A.    Scheme 1: Sixteen Week Billing Scheme.

91.    ERMI markets its DME as "The Standard of Care for the Non-Operative Treatment of Severe Motion Loss" and as "Clinically Proven to Recover Knee Flexon" and "Shoulder Motion without Surgery."[36]

92.    As ERMI's Chief Compliance Officer, Relator was charged with ensuring ERMI's billing practices complied with all applicable laws, rules, and regulations.

---

[35] *See* 42 C.F.R. § 414.230(b)(1).
[36] *See*, Ex. A-2 and Ex. A-7.

93.    As ERMI's Chief Compliance Officer, Relator had access to all of ERMI's billing records and documents, including claims paid and denied by the United States.

94.    As ERMI's Chief Compliance Officer, Relator maintained a position of privilege from which she personally observed and gained firsthand knowledge of ERMI's billing policies, practices, and procedures.

95.    Effective immediately upon Relator's termination as ERMI's Chief Compliance Officer on October 22, 2019, Relator's access to ERMI's billing records and other internal documents was cutoff.

### 1.    Relator Initiates "Denials Management" Investigation.

96.    One of Relator's primary responsibilities as ERMI's Chief Compliance Officer included "Denials Management."

97.    Denials Management is a strategic process that aims to unmask and resolve problems leading to medical claim denials.  Denials Management also includes mitigating the risk of future denials and ensuring a healthy cash flow.[37]

98.    Shortly after Relator began working at ERMI, she learned that a significant number of ERMI's Medicare claims were being denied regularly.

---

[37] https://apexedi.com/denial-management-what-is-it-how-does-it-work/

99.    Relator also learned that, contrary to the ordinary and customary practice in the healthcare industry, ERMI was making no effort to appeal any of these numerous Medicare denials.

100.    Relator thus initiated a Denials Management investigation to determine why such a substantial volume of Medicare claims were being denied and why ERMI was doing nothing to manage this large volume of denials.

101.    Relator initiated her Denials Management investigation with the objective of instituting effective countermeasures to reduce the volume of denials and to implement a regular procedure and process to streamline appeals of future denials.

102.    Although Relator's Denials Management investigation was initially limited to Medicare claims, it expanded rapidly as she continued to discover additional issues that raised serious red flags from a compliance perspective.

103.    The volume of denials and ERMI's refusal to manage them immediately set off red flags for Relator.

104.    As Relator began to see patterns in the Medicare denials emerging, she became increasingly concerned that the same issues existed across payors, including other United States payors.

24

105.   Relator thus expanded her investigation to claims denied by other United States payors, including the VA and the OWCP.

106.   As part of Relator's Denials Management investigation, she, met with ERMI's vice president of reimbursement and head of the billing department, Shicoy Oxygene, regularly to discuss potential issues and review claims that had been denied.

107.   As part of the Denials Management investigation, Relator went through all available denied claims together with Oxygene.

108.   Because claims, whether paid or denied, submitted to the United States for payment or approval contain patient identifiable information, Relator did not maintain personal copies of the claims she reviewed.

109.   As part of Relator's Denials Management investigation, Relator personally spoke with the individuals within ERMI's billing department who were responsible for coding and submitting claims.

110.   In fact, Relator's cubical was adjacent to ERMI's billing department, with no door or other enclosure separating the two, where she had easy access to at least two members of the billing department and their records.

111.   Relator personally reviewed all available claims that had been denied and the documentation stating why they had been denied.

25

112.   Relator also personally reviewed ERMI's financial records and reports detailing the number of claims submitted, the individual and aggregate dollar amounts of claims submitted, to whom the claims were submitted, and the dollar amounts of ERMI's paid claims by each payor as part of her Denials Management Investigation.

113.   In an attempt to determine why claims were being denied, Relator also reviewed ERMI's claims that had been paid, including claims paid by United States payors other than Medicare.

114.   Relator's investigation continued to grow as she discovered more and more issues with ERMI's billing practices, policies, and procedures.

115.   As part of the Denials Management investigation, Relator personally reviewed claims that had been paid by the United States for DME provided to VA patients.

116.   Relator discovered, however, that there were no corresponding invoices for a substantial number of VA claims that had been paid.

117.   Relator's investigation subsequently revealed that some VA facilities were not going through the normal billing process.

118.   Rather, often times VA facilities paid for 16 weeks of ERMI DME usage upfront with government procurement debit cards.

26

119.   As Relator continued her investigation, she began organizing the denials into three (3) general categories: (a) Global Payments, (b) Medical Necessity, and (c) Clerical.

### (a)   Claims Denied Due to Clerical Errors.

120.   Relator's investigation revealed that a number of "Clerical" denials were due to typographical errors.

121.   Many of the clerical denials identified by Relator could have corrected easily.

122.   After correcting these clerical errors, ERMI could then resubmit the claims.

123.   Although these errors could have corrected easily and expeditiously, Relator was puzzled by ERMI's complete failure to even attempt to do so.

### (b)   Global Payments Denials.

124.   The United States will only pay claims for home DME if the patient is, in fact, at home.

125.   A patient who is in either a hospital or SNF is not "at home."

126.   Accordingly, the United States denies claims for home DME during any time period for which it knows that the patient is in either a hospital or SNF.

27

127.   Relator's experience in the health care industry has taught her that the United States will not pay home DME claims for patients who are in either a SNF or hospital.

128.   Relator learned quickly during her Denials Management investigation that ERMI had no program or policy in place to monitor patient DME usage.

129.   Specifically, Relator's investigation revealed that ERMI was doing nothing to ensure patients were actually using the DME during the periods for which it was invoicing the United States.

130.   As a result of ERMI's failure to do anything to ensure patients were actually using the DME, it regularly submitted claims to the United States for payment or approval for periods during which patients were in SNFs or hospitals.

131.   Relator, as part of her investigation, placed claims that had been denied because the patient was either in a SNF or hospital into the "Global Payments" category.

### (c)    Medical Necessity Denials.

132.   Based on Relator's personal review of ERMI's invoices, claims, and other billing records as well as her discussions with the individuals responsible for billing, she discovered that all claims submitted for every patient, regardless of payor, sought payment for 16 weeks of usage.

28

133.   Because the needs and uses of individual patients vary, the fact that every single claim submitted by ERMI sought payment for 16 weeks of DME usage raised another red flag for Relator.

134.   All claims must be supported by documentation that the DME is medically necessary for the entire invoiced period.

135.   The United States only pays for home DME that is medically necessary.

136.   If the United States determines that home DME is not, or is no longer, medically necessary, it will deny any claim seeking payment for usage during such time.

137.   The "Medical Necessity" denials category thus consisted of claims that had been denied because the United States determined that the DME was not, or was no longer, medically necessary.

138.   Relator considered the medical necessity denials to be a serious issue that ERMI needed to address immediately.  Namely, ERMI could not legally submit claims in the absence of documentation showing that the DME is medically necessary for the entire period covered by the claim.

139.   After speaking with members of ERMI's billing department, Relator still could not understand why all of ERMI's claims, irrespective of payor, patient, or actual usage, sought payment for 16 weeks of usage.

140.   Relator immediately began taking steps that she hoped would help reduce the number of Medical Necessity denials.

141.   Relator thus informed Oxygene that ERMI could not legally submit claims for 16 weeks of usage unless it could provide the United States with documentation supporting "medical necessity" for the entire 16 weeks.

142.   To Relator's amazement, Oxygene could not provide straight answers regarding whether ERMI had documentation to support medical necessity for the entire 16 weeks or why it always automatically billed for 16 weeks of usage.

### 2.    Relator's Recommendations Fall on Deaf Ears.

143.   As Relator's investigation progressed, she provided ERMI leadership with regular updates during their weekly leadership meetings.

144.   Relator also provided ERMI's leadership with her most recent findings as well as recommendations as to how ERMI could address certain issues and reduce the volume of denials.

145.   Over a period of several months, Relator recommended ERMI implement several initiates that would help reduce the volume of denials quickly and easily.

146.    Relator made these recommendations directly to key members of ERMI's leadership, including: (a) ERMI's CEO, Mikael Ohman; (b) ERMI's national sales director, Doug Easily; (c) Branch; and (d) Oxygene.

147.    The measures recommended by Relator to ERMI's leadership, among others, included: (a) implementing a program and procedures to routinely check on patients to confirm their continued need for, and use of, the DME; (b) picking up and removing DME from the homes of patients who were no longer using the DME; and (c) ensuring DME was left with patients only as long as it continued to be medically necessary and actually used by the patient.

148.    For reasons unbeknownst to Relator, ERMI leadership refused to implement any of her recommendations.

### 3.    Relator Learns that Performing "Medical Necessity" Checks will Jeopardize ERMI's "16-Week Program" Billing Scheme.

149.    Because ERMI refused to implement a medical necessity check program, claims continued to be denied for "Global Payments."

150.    In Spring 2019, Relator again raised the need for a medical necessity check program during a weekly leadership meeting.

151.    When Relator inquired as to why ERMI had not instituted a medical necessity check program, she was told by Natalie Moretz, ERMI's Director for Sales

for the West Region, that ERMI "cannot do medical necessity checks" because it has to wait for the sales representative to go back to the patients' home and pick up the equipment which is not scheduled until after the 16 weeks.

152.  Ms. Moretz also stated to Relator that performing medical necessity checks "would be too complicated."

153.  Finally, in spring 2019, Moretz explained to Relator that ERMI's billing practices are based on its "16-Week Program."  That is, Relator was told for the first time that, no matter how long the patient actually needs or uses the device, ERMI always bills payors, including the United States, for 16 weeks of usage.

154.  Per ERMI's "16-Week Program" billing scheme, even if ERMI knows that the device is sitting unused on the patient's front porch it will not retrieve the DME so that it can justify billing the payor for 16 weeks of usage.

155.  As Chief Compliance Officer, Relator established a "Compliance Hotline."

156.  As Chief Compliance Officer, Relator was responsible for monitoring and reviewing communications submitted by patients and medical providers via the Compliance Hotline.

157.  Relator's review of communications submitted via the Compliance Hotline revealed that patients frequently call after eight (8) to twelve (12) weeks to

inform ERMI that they are no longer using the DME and to request that it be picked up from their homes.

158.   Relator's review of communications submitted via the Compliance Hotline also revealed that ERMI categorically ignored requests to pick up DME before 16 weeks.

159.   As such, Relator learned during her Denials Management investigation that ERMI summarily ignores requests to pick up DME sooner than 16 weeks solely to justify its policy mandating payors, including the United States, always be billed for the full 16 weeks irrespective of how long the DME is actually used or is medically necessary.

### 4.   Relator Discovers ERMI's Internal Documents Cannot Support "Medical Necessity" for 16 Weeks.

160.   Relator's duties as Chief Compliance Officer also included submitting required documentation to state licensing authorities.

161.   As Chief Compliance Officer, Relator reviewed ERMI's internal medical research to determine whether it supported the medical necessity of ERMI's DME for the entire "16-Week Program" billing scheme.

162.   As Chief Compliance Officer, Relator had access to and reviewed ERMI's internal medical research.

163.    Relator thus gained personal knowledge of ERMI's internal medical pursuant to her role and responsibilities as Chief Compliance Officer.

164.    Relator's Denials Management investigation and review of ERMI's internal medical research failed to uncover any documentation supporting ERMI's "16-Week Program" billing scheme or the medical necessity of ERMI's DME for the entire 16 weeks.

165.    In fact, Relator learned during her Denials Management investigation that ERMI's internal medical research shows that its DME is not medically necessary beyond 10 weeks.

166.    Relator thus has firsthand personal knowledge of ERMI's internal research showing (a) that its DME is not medically necessary beyond 10 weeks and (b) that ERMI knew it could not support the medical necessity of claims submitted pursuant to its "16-Week Program" billing scheme.

167.    Because ERMI cannot support medical necessity beyond 10 weeks, Relator informed Branch, Base, Ohman, Madrid, Moretz, and others that ERMI cannot legally continue to submit claims for 16 weeks of DME usage that it knows are not medically necessary.

168.   Relator also informed Branch, Base, Ohman, Moretz, and Madrid that there would be significant legal repercussions if ERMI continued its "16-Week Program" billing scheme.

169.   Although ERMI's internal documents establish that its DME is not medically necessary beyond 10 weeks, ERMI's corporate policy mandates that its customers, including the United States, always be billed for 16 weeks of usage.

170.   Although ERMI's internal documents establish that its DME is not medically necessary beyond 10 weeks, ERMI continued its policy and practice of always automatically billing its customers, including the United States, for 16 weeks of usage.

171.   Based on Relator's personal knowledge gained as ERMI's Chief Compliance Officer, neither medical necessity nor actual usage is considered by ERMI before submitting claims for 16 weeks of usage to its customers, including the United States.

172.   Based on Relator's personal knowledge gained as ERMI's Chief Compliance Officer, ERMI bills the United States for 16 weeks of usage irrespective of medical necessity, how long the patient actually uses the device, or if the patient has been admitted to a SNF or hospital.

### 5.    Audit of Physician Signatures.

173.    At the time Relator began working as ERMI's Chief Compliance Officer, the only thing that ERMI audited was physician signatures.

174.    Based on Relator's personal knowledge gained as ERMI's Chief Compliance Officer, ERMI sales representatives advise doctors to write all ERMI DME prescriptions for the full 16 weeks.

175.    In Relator's role as Chief Compliance Officer, she reviewed the results of ERMI's physician signature audit, which included actual copies of physician prescriptions.

176.    During Relator's review of ERMI's physician signature audit, she discovered many instances where sales representatives had written the prescriptions themselves for the full 16 weeks.  The sales representatives then either forged the doctor's signature or merely presented the prescription to the doctor for his or her signature or rubber stamp.

177.    Relator's review of ERMI's physician signature audit also revealed instances where, although the doctor wrote the prescription for less than 16 weeks, ERMI ignored the prescription and billed the United States for the full 16 weeks nonetheless.

178.   Because the prescriptions and documentation Relator accessed and reviewed as part of her review of ERMI's physician signature audit contain protected patient identifiable information, she did not maintain personal copies of these records.   Accordingly, all documents evidencing Relator's findings regarding the physician signature audit are in ERMI's exclusive possession, custody, and control.

### 6.   ERMI Leadership Confirms its "16-Week Program."

179.   Relator concluded her Denials Management investigation in June 2019.

180.   After concluding the investigation, Relator confronted key members of ERMI's leadership, including Branch, Oxygene, Ohman, Madrid, and Base, with her findings, namely that ERMI could not continue its "16-Week Program" billing scheme by submitting claims that it knows are not supported by medical necessity.

181.   When confronted by Relator with her findings, Branch, Ozygene, Ohman, Madrid, and Base all confirmed ERMI's "16-Week Program" billing scheme whereby all claims seek payment for 16 weeks of usage.

182.   To Relator's dismay, Branch and Madrid were openly proud of the 16-Week Program" billing scheme because they thought it made ERMI appear more attractive to potential investors.

183.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI

leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, and her discussions with key members of ERMI leadership, Relator gained firsthand knowledge that ERMI's policy, pattern, and practice of automatically billing the United States for 16 weeks of usage is built directly into ERMI's business and financial models.

184.  ERMI's annual budget, which is personally approved by Branch, is based expressly on its "16-Week Program" billing scheme and policy of automatically billing all payors, including the United States, for 16 weeks of usage irrespective of actual use or medical necessity.

185.  Accordingly, ERMI's annual budget approved by Branch is based on 16 weeks of revenue for *every* unit of DME that ERMI places with a patient and for which it seeks payment.

### 7.    ERMI Shops Its "16-Week Program" to Potential Investors.

186.  In Spring 2019, ERMI retained the investment banking firm William Blair & Company, with Kunal Jain as its point of contact, to prepare the company for a potential "capital transaction."

187.  Throughout the spring and summer of 2019, ERMI hosted a number of "road shows" during which it made presentations "shopping" the company to potential investors.

188.   Relator personally attended at least two dozen of ERMI's "road shows" during which it "shopped" itself to potential investors and/or brokers in the hopes of generating a substantial capital infusion.

189.   Branch, Ohman, and Madrid attended and actively participated in every one of the at least 25 "road shows" Relator attended.

190.   Madrid presented ERMI's "16-Week Program" as a major selling point during each "road show" that Relator attended.

191.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid stated to potential investors that, for each and every DME unit that ERMI places with a patient, ERMI always bills the payor, including United States payors, for 16 weeks of usage.

192.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid made forward looking financial projections to potential investors based on 16 weeks of revenue for each and every unit placed with a patient, including VA, OWCP, and Medicare patients.

193.   Relator, pursuant to her role as Chief Compliance Officer, was routinely included in emails to and from ERMI's investment banker, Kunal Jain.

194.   Jain's emails to ERMI management, including Relator, provided advice regarding possible questions from potential investors.

39

195.   Jain also provided ERMI with possible questions from potential investors that ERMI leadership needed to be prepared to answer.

196.   To help ERMI prepare for the "road shows," Jain compiled a list of these questions t.  *See*, *e.g.*, William Blair & Company Presentation/Diligence Prep Questions hereto as **Exhibit M.**

197.   Jain and ERMI leadership worked together to frame ERMI's responses to the list of possible questions from potential investors that Jain compiled.

198.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid boasted about the lucrative prices that ERMI charges the United States for DME provided to VA and OWCP patients.

199.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid disclosed to potential investors the prices that ERMI charges the United States for DME provided to VA and OWCP patients.

200.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid pointed out the fact that the United States Department of Labor is ERMI's largest workers' compensation payor and that not only does it pays the highest prices for workers' compensation payors, it pays the highest prices for any payor.

201.   As such, Jain advised ERMI leadership to be prepared to answer likely questions from potential investors regarding "[w]hy does largest WC payor (Department of Labor) pay a higher daily rate than other TPAs?"

| vii. | Why does largest WC payor (Department of Labor) pay a higher daily rate than other TPAs?  It appears they have been losing volume but rates have been making up for that. |
|---|---|

Ex. M-3.

202.   At every one of the at least 25 "road shows" that Relator personally attended, Madrid tied the prices the United States pays ERMI for DME provided to VA and OWCP patients to ERMI's "16-Week Program" billing scheme by stating "we are guaranteed these prices for 16 weeks."

203.   Jain, in apparent recognition of the issues associated with ERMI's "16-Week Program," advised ERMI leadership to be prepared to answer questions regarding "[h]ow do you ensure (and monitor) patient compliance?"  Ex. M-4.

204.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, and her attendance at no less than 25 investor "road shows," Relator has firsthand personal knowledge that ERMI could not answer questions regarding how

much time it spends on "patient follow up" or what it does to "ensure (and monitor) patient compliance" because ERMI refuses to implement a medical necessity check program.  *See*, Ex. M-4.

### 8.    ERMI's Efforts to Obtain Capital Infusion Fail.

205.   By the end of summer 2019, ERMI's efforts to court a "capital transaction" proved unsuccessful.

206.   On August 24, 2019 at 7:33 AM, Branch informed Relator that her compliance "team was assembled to take over ERMI and prepare it for a capital transaction and for growth of the company.  After investing $3.5 million back into the company, we have failed to achieve our goals in every way."[38]  Said Aug. 24, 2019 email is attached hereto as **Exhibit T** at Ex. T-2 – Ex. T-3.

207.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, and her attendance at over 25 investor "road shows," Relator has firsthand personal knowledge that ERMI's fraudulent "16-Week Program" billing

---

[38] Said August 24, 2019 7:33 AM email from Thomas Branch attached hereto as **Exhibit J** at Ex. J-2.

scheme is built directly into its financial and business models and that ERMI leadership intentionally and knowingly presented potential investors with financial projections based the fraudulent "16-Week Program" billing scheme that she had personally advised them was illegal.

208.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, and her attendance at no less than 25 investor "road shows," Relator has firsthand personal knowledge that ERMI proudly explained its fraudulent "16-Week Program" billing scheme that they knew was illegal dozens of times to potential investors and brokers during the spring and summer of 2019.

B.   **Relator's Personal Knowledge of ERMI's Financial Reports.**

209.   As a member of ERMI's senior leadership, Relator was regularly provided with, had access to, and thus gained personal knowledge of ERMI's financial reports, records, and information.  *See*, *e.g.*, Ex. K – Ex. L, Ex. N – Ex. S, Ex. U.

210.   As a member of ERMI's senior leadership, Relator was regularly provided with, had access to, and thus gained personal knowledge ERMI's financial

43

reports detailing, among other things, the number of claims presented by ERMI to the United States for approval and payment, the amounts ERMI charges the United States for DME, and the amounts ERMI was actually paid by the United States. *See*, July 2019 ERMI Financial Operations Review – Cash spreadsheet attached hereto as **Exhibit U**;[39] *see also*, Ex. K – Ex. L and Ex. N – Ex. S.

211.   ERMI, during the ordinary course of its business operations, prepares and distributes financial reports to members of its leadership team.

212.   As a member of ERMI's senior leadership team, Relator regularly received ERMI financial reports during the time that she served as Chief Compliance Officer.

213.   Despite Relator's access to ERMI documents being cut off abruptly and without warning upon her termination, she was able to maintain personal copies of several internal financial reports.

214.   ERMI, during the ordinary course of its regular business operations, tracks its nationwide financial performance.

215.   ERMI, during the ordinary course of its regular business operations, also tracks its financial performance in its five biggest markets, including Florida.

---

[39] In compiling the "Goals" outlined in **Exhibit U**, ERMI specifically "carved out" the amounts billed *and paid* by the U.S. Department of Labor from those billed and paid by other workers' compensation payors.

216.   ERMI, during the ordinary course of its regular business operations, tracks its financial performance along multiple metrics, including major payor categories such as Medicare, VA, workers' compensation, and others.  *See*, March 2019 ERMI Operations Review – VA spreadsheet attached hereto as **Exhibit N**; *see also*, March 2019 ERMI Operations Review – WC spreadsheet attached hereto as **Exhibit O**

217.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, in 2018, ERMI presented 7,611 claims to the United States for payment or approval for DME provided to VA patients nationwide.  Ex. N-2.

218.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, from January to March 2019, ERMI presented 1,701 claims to the United States for payment or approval for DME provided to VA patients nationwide.  Ex. N-3.

219.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, from April to July 2019, ERMI presented 658 claims to the United States for payment or approval for DME provided VA patients in Florida.  *See* July 2019 ERMI Financial

Operations Review – VA Florida spreadsheet attached hereto as **Exhibit R** at Ex. R-
2.

220.   As a result of Relator's Denials Management investigation, her review
of ERMI's financial operations and records, her attendance at weekly ERMI
leadership meetings, her numerous conversations and daily interactions with
members of ERMI's billing department, her discussions with key members of ERMI
leadership, her review of ERMI's internal medical research, and her attendance at
over 25 investor "road shows," Relator has personal firsthand knowledge that all
9,970 claims submitted to the United States for payment or approval for DME
provided to VA patients from January 2018 to July 2019 sought payment for 16
weeks of usage.

221.   As a result of Relator's Denials Management investigation, her review
of ERMI's financial operations and records, her attendance at weekly ERMI
leadership meetings, her numerous conversations and daily interactions with
members of ERMI's billing department, her discussions with key members of ERMI
leadership, her review of ERMI's internal medical research, and her attendance at
over 25 investor "road shows," Relator has personal firsthand knowledge that
ERMI's internal documents establish that none of the 9,970 claims submitted to the

United States for payment or approval for DME provided to VA patients from January 2018 to July 2019 are supported by medical necessity.

222.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, in 2018, ERMI presented 2,093 claims to the United States for payment or approval for DME provided to OWCP patients nationwide.  *See*, March 2019 ERMI Operations Review WC attached hereto as **Exhibit O** at Ex. O-2.

223.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, between January and March 2019, ERMI presented 369 claims to the United States for payment or approval for DME provided to OWCP patients nationwide.  Ex. O-3.

224.   Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, between April and July 2019, ERMI presented 58 claims to the United States for payment or approval for DME provided to OWCP patients in Florida.  *See*, July 2019 Financial Operations Review – WC Florida spreadsheet attached hereto as **Exhibit S** at Ex. S-2.

225.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI

47

leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, her review of ERMI's internal medical research, and her attendance at over 25 investor "road shows," Relator has personal firsthand knowledge that all 2,520 claims submitted to the United States for payment or approval for DME provided to OWCP from January 2018 thought July 2019 sought payment for 16 weeks of usage.

226.    As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, her review of ERMI's internal medical research, and her attendance at over 25 investor "road shows," Relator has personal firsthand knowledge that ERMI's internal documents establish that none of the 2,520 claims submitted to the United States for payment or approval for DME provided to OWCP patients from January 2018 to July 2019 are supported by medical necessity.

227.    Based on Relator's personal knowledge of ERMI's financial operations and reports gained as a result of her position as Chief Compliance Officer, between January 2018 and July 2019, ERMI presented 4,145 claims to the United States for

48

payment or approval for DME provided to Medicare patients nationwide.  *See*, July 2019 ERMI Financial Operations Review – MCR spreadsheet attached hereto as **Exhibit Q**.

228.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, her review of ERMI's internal medical research, and her attendance at over 25 investor "road shows," Relator has personal firsthand knowledge that all 3,467 claims submitted to the United States for payment or approval for DME provided to Medicare patients from January 2018 to July 2019 sought payment for 16 weeks of usage.

229.   As a result of Relator's Denials Management investigation, her review of ERMI's financial operations and records, her attendance at weekly ERMI leadership meetings, her numerous conversations and daily interactions with members of ERMI's billing department, her discussions with key members of ERMI leadership, her review of ERMI's internal medical research, and her attendance at over 25 investor "road shows," Relator has personal firsthand knowledge that ERMI internal documents establish that none of the 3,467 claims submitted to the United

States for payment or approval for DME provided to Medicare patients from January 2018 to July 2019 are supported by medical necessity.

230.    Accordingly, through Relator's work as ERMI's Chief Compliance Officer, her review of hundreds of invoices submitted to the United States for payment or approval, her review of ERMI's internal medical research and financial reports, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator gained firsthand, personal knowledge that each and every one of the over 15,957 claim submitted by ERMI to the United States for payment or approval from January 2018 to July 2019 fraudulently seeks payment for 16 weeks of DME usage that, at the time the claims were submitted, ERMI knew were not supported by medical necessity.

### C.    Scheme 1: Sixteen Week Billing Scheme—Make-or-Use.

231.    Medicare providers, including ERMI, submit reimbursement claims to the United States by using a CMS 1500 Form or its electronic equivalent, the 837P Form.[40]

---

[40] A sample CMS 1500 Form is attached hereto as **Exhibit E** and incorporated herein by express reference.

232.   ERMI, like all other DME suppliers, makes certain certifications in every CMS 1500 Form its presents to the United States for payment or approval:



SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, TRICARE, FECA AND BLACK LUNG)
In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reported in the designated section.For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

[41]

233.   Accordingly, every time ERMI submits a CMS 1500 Form to the United States for payment or approval, it certifies that (a) the information on the form is true, accurate, and complete; (b) the government has been provided sufficient information required to allow it to make an informed eligibility and payment decision; (c) the claim complies will all applicable Medicare and/or Medicaid laws, regulations, and program instruction for payment including but not limited the AKS; and (d) the services were medically indicated and necessary to the health of the patient.

234.   A supplier "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" in violation of 31 U.S.C. § 3729(a)(1)(B) if it submits a CMS 1500 Form or 837P Form with knowledge that (a) information in it is untrue, inaccurate, or incomplete; (b) the government lacks

---

[41] Ex. E-2.

sufficient information required to allow it to make an informed eligibility and payment decision; (c) the claim fails to comply with all applicable Medicare and/or Medicare laws, regulations, and program instructions for payment including but not limited to the AKS and the Stark Law; or (d) the services claimed were not medically indicated or necessary.

235. As Chief Compliance Officer, Relator had access to and gained personal knowledge of ERMI's internal medical research showing that its DME is not medically necessary beyond 10 weeks.

236. During Relator's Denials Management investigation, she gained personal firsthand knowledge that ERMI had not disclosed its internal medical research showing that its DME is not medically necessary beyond 10 weeks to the United States.

237. Pursuant to Relator's role and responsibilities as Chief Compliance Officer, she confronted ERMI's leadership during a June 2019 weekly leadership meeting regarding ERMI's inability to support the medical necessity of its DME during the entire "16-Week Program" billing scheme.

238. After being confronted by Relator, ERMI leadership nonetheless refused to discontinue ERMI's policy of automatically billing its customers,

including the United States, for 16 weeks of DME usage despite actual knowledge that ERMI could not support the medical necessity of such claims.

239.  Without ERMI's internal research, the United States did not have sufficient information to make an informed payment decision.

240.  Based on Relator's firsthand knowledge gained as ERMI's Chief Compliance Officer, ERMI knew that it was required to disclose its internal medical research showing that its DME is not medically necessary beyond 10 weeks to the United States.

241.  Based on Relator's firsthand knowledge gained as ERMI's Chief Compliance Officer, ERMI knew that, without its internal medical research showing that its DME is not medically necessary beyond 10 weeks, the United States did not have sufficient information to make an informed payment decision.

242.  ERMI nonetheless continued its policy and practice of automatically billing its customers, including the United States, for 16 weeks of DME usage irrespective as to how long the patient actually uses the DME.

243.  ERMI thus continued its policy and practice of automatically billing its customers, including the United States, for 16 weeks of DME usage despite (a) actual knowledge that its claims are not supported by medical necessity; (b) intentionally refusing to take any measures to ensure that patients are actually using the DME

53

during the any of the invoiced periods; and (c) refusing to pick up DME that it knows patients are not using.

**D.    Scheme 2: Concealment of Best Prices.**

244.    Based on Relator's personal knowledge of ERMI's financial operations and reports, ERMI routinely tracks as part of its regularly conducted business operations the total amounts billed to and paid by payor and payor category.  *See*, Ex. K.

245.    Based on Relator's personal knowledge of ERMI's financial operations and reports, ERMI routinely tracks as part of its regularly conducted business operations the total amounts billed to and paid by the United States for DME provided to VA, Medicare, and OWCP (listed as Department of Labor on ERMI's internal reports) patients.  Ex. K.

246.    Based on Relator's personal knowledge of ERMI's financial operations and reports, ERMI routinely tracks as part of its regularly conducted business operations the average monthly and yearly prices paid per payor category.  Ex. K.

**1.    Number of Claims Submitted, Amounts Charged, Amounts Paid, and Average Price per Payor.**

247.    Based on Relator's personal knowledge of ERMI's financial operations and reports, from January 2018 to July 2019, ERMI submitted 9,970 claims to the

United States for payment or approval for DME provided to VA patients nationwide. Ex. N-2 – Ex. N-3; Ex. R-2.

248.    Based on Relator's personal knowledge of ERMI's financial operations and reports, from January 2018 to July 2019, ERMI submitted 2,520 claims to the United States for payment or approval for DME provided to OWCP patients nationwide.  Ex. O-2; Ex. R-2.

249.    Based on Relator's personal knowledge of ERMI's financial operations and reports, from January 2015 to December 2018, the United States approved *and paid* ERMI **$50,538,978.27** on claims for DME supplied to VA patients nationwide. Ex. K-1.

250.    Based on Relator's personal knowledge of ERMI's financial operations and reports, from January 2018 to March 2019, the United States approved *and paid* ERMI **$7,400,209.90** on claims for DME provided to OWCP patients nationwide. Ex, O-2 – Ex. O-3.

251.    Based on Relator's personal knowledge of ERMI's financial operations and reports, from January 2015 to December 2018, the United States approved *and paid* ERMI **$2,080,109.67** on claims for DME supplied to Medicare patients nationwide.  Ex. K-1.

252.   Based on Relator's personal knowledge of ERMI's financial operations and reports, ERMI was paid a national average of $2,640.22 per unit of DME provided to workers' compensation patients in 2018.  Ex. O-2.

253.   Applying elementary arithmetic, the average price ERMI charged the United States for DME provided to OWCP patients in 2018 is calculated by dividing the total amount paid ($6,210,134.72) by the total number of claims (2,093).

254.   Accordingly, the United States paid ERMI on average $2,967.09 per unit of DME provided to OWCP patients nationwide in 2018.

255.   Based on Relator's personal knowledge of ERMI's financial operations and reports, the United States paid ERMI on average $145.33 per unit of DME provided to Medicare patients nationwide in 2018. *See*, July 2019 ERMI Financial Operations Review – MCR spreadsheet attached hereto as **Exhibit Q** at Ex. Q-3.

256.   Based on Relator's personal knowledge of ERMI's financial operations and reports, the United States paid ERMI on average $1,703.31 per unit of DME provided to VA patients nationwide in 2018.  Ex. N-2.

## 2.   ERMI Knowingly Charges Unreasonable and Excessive Rates for DME Provided to VA and OWCP Patients.

257.   As shown above, the average nationwide prices ERMI charged the United States in 2018 for DME provided to VA ($1,703.31) and OWCP ($2,967.09)

patients are markedly higher than the average price charged for Medicare ($145.33) patients for the same DME for the same time.

258.   When Relator, like Jain,[42] confronted ERMI's leadership with the fact that ERMI charges one of its largest customers the highest price, Branch stated to Relator that ERMI had an agreement with the Department of Labor that specifically allowed ERMI to charge it significantly higher rates.

259.   No such agreement was, however, shown to or discussed with potential investors during any of the over 25 "road shows" that Relator personally attended.

260.   Although Relator had access to ERMI's contracts and pricing agreement as Chief Compliance Officer, she was neither provided with a copy of this purported agreement nor able to locate such an agreement within ERMI's files.

261.   If and to the extent an agreement existed between ERMI and the Department of Labor permitting ERMI to charge the Department of Labor significantly higher rates than other payors, Relator would have had access to such an agreement in her capacity as Chief Compliance Officer.

262.   Despite Relator's diligent efforts, she was unable to locate any such agreement between the Department of Labor and ERMI within ERMI's files.

---

[42] *See*, Ex. M-3 ("why does the largest customer pay the highest price?").

263.   Accordingly, through Relator's work as ERMI's Chief Compliance Officer, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator gained firsthand, personal knowledge that there is no agreement between the Department of Labor and ERMI authorizing ERMI to charge unreasonable and excessive rates for DME provided to OWCP patients.

### (a)   ERMI PDAC Prices and Codes.

264.   As Chief Compliance Officer, Relator had access to ERMI's PDAC Prices and Codes.

265.   As Chief Compliance Officer, Relator had position of privilege from which she personally observed ERMI's billing and coding practices.

266.   As Chief Compliance Officer, Relator gained personal firsthand knowledge of the maximum reimbursable amounts ERMI is permitted to charge payors, including the United States, for its DME.

267.   Medicare issued ERMI PDAC Prices and Codes for the maximum reimbursable amounts it will pay for ERMI DME.

268.   Once Medicare issued PDAC Prices and Codes for ERMI DME, private insurance companies will pay a percentage of the Medicare allowable rate.

269.   As Chief Compliance Officer, Relator gained personal firsthand knowledge that effective January 1, 2008, Medicare assigned ERMI's Knee Device PDAC Code E1811 with a maximum monthly reimbursement rate of $150.95.

270.   As Chief Compliance Officer, Relator gained personal firsthand knowledge that effective January 1, 2008, Medicare assigned ERMI's Shoulder Device PDAC Code E1841 with a maximum monthly reimbursement of $509.84.

271.   Based on Relator's position as Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator gained personal firsthand knowledge that ERMI and Branch were

dissatisfied with the PDAC billing codes that Medicare assigned ERMI's DME and, in 2010, appealed the PDAC codes to CMS.

272.    In furtherance of the appeal, Branch personally appeared at a public hearing before the CMS HCPCS Coding Workgroup in an attempt to persuade CMS to increase the reimbursable rates for ERMI DME.

273.    The Workgroup was unpersuaded by Branch's arguments and upheld the original PDAC codes.

274.    If a product has been assigned a PDAC code, the manufacturer must disclose such in subsequent FSS applications and is required to use that code in all claims submitted to the United States.

275.    Based on Relator's position as Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has personal firsthand knowledge that, pursuant to ERMI's "16-Week

60

Program," ERMI always automatically bills the United states for 16 weeks of DME usage for all Medicare, VA, and OWCP patients.

276.   Based on Relator's position as Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has personal firsthand knowledge that ERMI charges the United States substantially higher rates for the same DME provided to VA and OWCP patients than it charges for Medicare patients during the same 16 week period.

277.   ERMI is obligated to disclose to the VA and OWCP the rates that it charges Medicare for the same devices for the same period.

278.   As a result of Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical

research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has personal firsthand knowledge that ERMI intentionally failed to disclose to VA and OWCP payors the markedly lower rates that it charges Medicare patients for the same DME for the same period.

> **(b)   Relator Confronts ERMI Leadership Regarding Unreasonable and Excessive Rates During December 2018 Leadership Meeting.**

279.   Relator, along with Branch, Ohman, and Madrid, attended one of ERMI's regular weekly leadership meetings during December 2018.

280.   During the meeting, Relator confronted ERMI management, including Branch, with the fact that ERMI was charging the United States markedly higher rates for DME provided to VA and OWCP patients than it was for Medicare patients.

281.   In response, Branch admitted to Relator that ERMI charges the United States significantly higher rates for DME provided to VA and OWPC patients than it charges other customers, including Medicare patients.

282.   Perplexed by this billing practice, Relator asked Branch "Shouldn't they have the same prices?"

283.   Branch responded by stating emphatically to Relator that he "had earned the right" to charge the VA substantially higher rates because he had given thousands of units to veterans for free.

284.   At that time, Branch also represented to Relator that ERMI had an agreement with the VA permitting ERMI to charge the VA substantially higher rates than it charges Medicare.

285.   Although Relator asked Branch for a copy of this purported agreement, no such agreement was ever provided to her.

286.   As Chief Compliance Officers, Relator had access to ERMI's billing records and agreements.

287.   After the December 2018 meeting, Relator searched for, but could not find, the purported agreement with the VA that Branch claimed permitted ERMI to charge it substantially higher rates than Medicare.

288.   As a result of Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation

in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, her attendance at over two dozen investor "road shows," and her experience in the health care industry, Relator has personal firsthand knowledge that no such agreement exists whereby ERMI is permitted to charge the United States higher rates for DME provided to VA patients than it does for Medicare patients.

289.    Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, her attendance at over two dozen investor "road shows," and her experience in the health care industry, the rates that ERMI charges the United States for DME provided to VA and OWCP patients are unreasonable and excessive when compared to the rates that it charges Medicare patients for the same DME for the same amount of time.

**E.**    **Scheme 3: Activity in Florida.**

290.    ERMI leadership regularly and routinely stressed the importance of the Florida market during weekly ERMI leadership meetings.

291.    As Chief Compliance Officer, Relator was provided and had access to numerous financial documents, including financial documents specific to the Florida market.

292.    As Chief Compliance Officer, Relator had a privileged position from which to observe and review ERMI's billing policies, procedures, and practices, including those specific to the Florida market.

293.    As Chief Compliance Officer, Relator had a privileged position from which to observe and review ERMI's financial reports and documents, including those specific to the Florida market.

294.    Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing

departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that ERMI actively provided DME to Florida residents during the full six years preceding the filing of this action.

295.   Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that ERMI actively provided DME to Medicare, VA, and OWCP patients in Florida during the full six years preceding the filing of this action.

296.   Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding

practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that from January 2018 to July 2019, ERMI presented 227 claims for payment or approval to the United States for 16 weeks of DME usage for DME provided to OWCP patients in Florida.  Ex. S-1 – Ex. S-3.

297.  Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous

discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that from January 2018 to July 2019, the United States approved *and paid* ERMI $696,198.48 on claims for 16 weeks of DME usage for DME provided to OWCP patients in Florida. *Id*.

298.   Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that from January 2018 to July 2019, ERMI presented 2,627 claims for payment or approval to the United States for 16 weeks of DME usage for DME provided to VA patients in Florida.  Ex. R-1 – Ex. R-3.

299.    Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that from January 2018 to July 2019, the United States approved *and paid* ERMI $4,044,808.11 on claims for 16 weeks of DME usage for DME provided to VA patients in Florida. *Id*.

300.    Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations

specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that from January 2018 to July 2019, ERMI presented claims for payment or approval to the United States for 16 weeks of DME usage for DME provided to Medicare patients in Florida.[43]

301.   Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact

---

[43] Due to the relatively low number of ERMI Medicare nationwide, ERMI's financial reports do not list Florida Medicare patients separately.

that from January 2018 to July 2019, the United States approved *and paid* ERMI on claims for 16 weeks of DME usage for DME provided to Medicare patients in Florida.

### 1.    Florida Licensure Requirement.

302.   As Chief Compliance Officer, Relator was responsible for ensuring ERMI complied with all state and local licensing requirements.

303.   During Relator's time as Chief Compliance Officer, she was responsible for filing, and did in fact file, license applications with various state authorities, including the Florida Agency for Health Care Administration ("AHCA").

304.   Florida law requires all DME suppliers doing business in the state obtain a license from AHCA.  Accordingly, "[a]ny person or entity that holds itself out to the public as providing home medical equipment and services or accepts physician orders for home medical equipment and services is subject to licensure under" Florida law.[44]

---

[44] Fla. Stat. Ann. § 400.93(1).

305.   Florida law also requires DME suppliers to obtain separate AHCA licenses for each location from which they operate.[45]

306.   To ensure DME is stored in clean and sanitary environments, the Florida AHCA licensure process requires suppliers disclose all facilities at which they store DME and to make all such facilities available for inspection.

307.   Florida law also requires "any locations that sell, rent, or distribute, or offer to sell or rent to or for a consumer any home medical equipment that requires services" to obtain an AHCA license.[46]

308.   Facilities that must obtain an AHCA license include, among others, (a) "[a]ny location providing or distributing home medical equipment requiring services to consumers in Florida;" (b) "[a]ny location out of state that offers to sell or rent home medical equipment requiring services to consumers in Florida;" (c) "[a]ny location in state or out of state, with sales representatives working in Florida, that offers to sell or rent home medical equipment requiring services to consumers in Florida;" and (d) "[a]ny buildings, that are not located at the licensed central service center address, called shops, warehouse, distribution centers, or called by any other

---

[45] Fla. Stat. Ann. § 400.93(4) ("A separate license is required of all home medical equipment providers operating on separate premises, even if the providers are operated under the same management.").
[46] Fla. Admin. Code § 59A-25.002(1).

name" that provides "delivery, set up, consumer instruction or maintenance of equipment to consumers in Florida."[47]

309.   Providing DME to Florida residents without a valid AHCA license is a violation of Florida's Unfair and Deceptive Trade Practices Act.

310.   Obtaining and maintaining a valid AHCA license to provide DME to Florida residents is a material requirement of Florida law.

311.   As part of the Florida licensure process, all ERMI employees who enter patients' homes must pass a level 2 background check.

### 2.    ERMI's Operations within Florida.

312.   Due to the size and weight of ERMI's DME, it cannot be shipped directly to a patient's home, including patients residing in Florida.

313.   As such, ERMI ships its DME from Atlanta, Georgia to locations within Florida where the DME is then assembled, repaired, and/or stored.

314.   Individuals working for and/or under the direction of ERMI (whether as employees or independent contractors) deliver ERMI DME from locations within Florida to the homes of patients in Florida.

---

[47] Fla. Admin. Code § 59A-25.002(1)(a)-(f).

315.  As part of the delivery, individuals working for and/or under the direction of ERMI enter the patient's home, including the homes of patients in Florida, to set up ERMI DME and to instruct the patient on how to use ERMI DME.

316.  The fact that Florida is one of ERMI's largest markets was a major selling point presented to potential investors during each of the over 25 "road shows" that Relator personally attended.

317.  Specifically, Jain advised ERMI leadership on how to discuss how ERMI "intend[ed] to drive deeper penetration in" the Florida market during the its "road shows" with potential investors.  Ex. M-3.

318.  Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact

that ERMI submitted 2,854 claims totaling $4,741,006.59 to the United States for payment or approval between January 2018 and July 2019 for DME provided to OWCP and VA patients in Florida.

| Florida: January 2018 to July 2019 | | | |
|---|---|---|---|
| | OWCP | VA | Total |
| Claims | 227 | 2,627 | 2,854 |
| Charges | $696,198.48 | $4,044,808.11 | $4,741,006.59 |
| Average | $3,066.95 | $1,539.71 | |

Ex. R and Ex. S.

### 3. ERMI's Unlicensed Activities in Florida.

319. Based on Relator's personal knowledge of ERMI's financial operations and reports as well as its business practices, policies, and procedures specifically relating to the Florida market gained through her position as Chief Compliance Officer, ERMI began operating in Florida more than six years prior to the filing of this action.

320. As Chief Compliance Officer, Relator reviewed state licenses issued to ERMI, including licenses issued to ERMI prior to her employment as Chief Compliance Officer.

321. Based on Relator's review of state licenses issued to ERMI prior to her employment as Chief Compliance Officer, Relator has firsthand knowledge of the fact that ERMI was issued its first Home Medical Equipment Provider License by

the Florida AHCA on October 13, 2016 under the name End Range of Motion Improvement, Inc.[48]

322.    Thus, Relator has firsthand knowledge that ERMI was actively operating in Florida prior to October 13, 2016 without the requisite Florida AHCA license.

323.    ERMI's 2016 Florida AHCA License expired on October 12, 2018.[49]

324.    After ERMI's 2016 Florida AHCA License expired on October 12, 2018, ERMI, at the direction of Branch, knowingly continued to provide DME to consumers in Florida.

325.    On November 1, 2019, the Florida AHCA issued ERMI a second Home Medical Equipment Provider License in the name of "End Range Of Motion Improvement LLC" (the "2019 Florida AHCA License").[50]

326.    The time periods before October 13, 2016 and from October 13, 2018 to October 31, 2019 are collectively referred to as the "Unlicensed Activity Periods."

327.    Based on Relator's review of state licenses issued to ERMI prior to her employment as Chief Compliance Officer, Relator has firsthand knowledge of the

---

[48] A true and correct copy of the 2016 Florida AHCA License is attached hereto as **Exhibit F**.

[49] Ex. F-1.

[50] A true and correct copy of the 2019 Florida AHCA License is attached hereto as **Exhibit G**.

fact that ERMI knowingly operated in Florida without the requisite Florida AHCA

license, valid or invalid, during the Unlicensed Activity Periods.

328.   As May 2019, ERMI's ongoing unlicensed activities in violation of

Florida law were no secret.

329.   Facing a potential injunction in another lawsuit that would shut down

ERMI's Florida operations, as shown in the below text chain, ERMI's management

team was entering damage control:

```
----------------------------
From: +14044030451 Mikael  Ohman
Timestamp: 5/29/2019 7:34:13 PM(UTC-5)
Source App: Native Messages
Body:
Great.  We'll wait on Dentons regulatory practice to make sure we're clear to resume doing business in FL.
For now, given the risk of criminal penalties here for all of us, we will not bill or collect any $ from FL
patients.
----------------------------
From: elizabethacooley@gmail.com Elizabeth Cooley (owner)
Timestamp: 5/29/2019 9:36:18 PM(UTC-5)
Source App: Native Messages
Body:
And risk to our amazing FL team. Too important in the long run.
----------------------------
From: +14044030451 Mikael  Ohman
Timestamp: 5/29/2019 9:55:06 PM(UTC-5)
Source App: Native Messages
Body:
I don't want to be part of a criminal trial having to defend why I or any of us helped oversee an unlicensed
DME operation in FL after license expired.

Assuming we don't want/need negative press as a company if this blows up, I'll be working in background to
line up a qualified PR firm that can help us in case shit hits the fan.
----------------------------
```

330.   Notably, despite actual knowledge that ERMI did not have a license to

operate in Florida, ERMI deliberately chose to continue doing business in Florida

without a license.

331.   As of May 2019, ERMI leadership knew that ERMI was not in compliance with all applicable state and federal laws and regulations.

332.   Specifically, as of May 2019, ERMI leadership knew that ERMI was actively violating Florida law by continuing to provide DME to patients in Florida without a license to do so.

333.   ERMI leadership nonetheless directed ERMI to continue operating in Florida and to continue submitting knowingly false certifications to the United States that ERMI was in compliance with all applicable state and federal laws and regulations, including Florida's licensure requirement.

334.   During a weekly ERMI leadership meeting in May 2019, Relator warned ERMI leadership of the risks of continuing to do business in Florida without the requisite AHCA license.

335.   ERMI leadership, namely Branch, ignored Relator's advice and directed ERMI to continue operating in Florida without the requisite Florida AHCA license.

336.   Facing potential disruption in one of ERMI's five largest markets, ERMI Leadership, including Branch, began directing ERMI employees to state *falsely* that all ERMI DME was shipped directly to the homes of patients in Florida from ERMI's Atlanta, Georgia facilities.

78

337.    On or about July 26, 2019, ERMI received a Notice of Intent to Deem Initial Application Incomplete and Withdrawn From Consideration (hereinafter, the "Notice") from the Florida AHCA.

338.    Per the Notice, ERMI was informed that it was prohibited from engaging in business in the State of Florida in the absence of a licensed physical location within the State subject to inspection.

339.    In response to the Notice, ERMI, at the direction of Branch, again represented *falsely* to the Florida AHCA that all ERMI DME is shipped directly from its Atlanta, Georgia facility to the homes of consumers in Florida.

340.    ERMI, at the direction of Branch, responded further to the Notice by representing *falsely* that only on a few rare occasions has ERMI temporarily stored DME in Florida.

341.    At the time ERMI responded to the Notice, ERMI knew the information that it had provided to the Florida AHCA was false.

### 4.    Fraudulent License Periods.

342.    ERMI, Inc. registered as a foreign corporation with the Florida Secretary of State on June 22, 2016.

79

343.   On October 13, 2016, the Florida AHCA issued ERMI a home medical equipment provider license (the "2016 Florida AHCA License") in the name of "End of Range Motion Improvement, Inc."[51]

344.   On November 1, 2019, the Florida AHCA issued ERMI a second home medical equipment provider license (the "2019 Florida AHCA License") in the name of "End of Range Motion Improvement, Inc."[52]

345.   To obtain both the 2016 and 2019 Florida AHCA Licenses, ERMI had to submit detailed applications signed by duly authorized officers swearing under oath that the information contained in the applications was true and correct.

346.   As part of the licensure process, ERMI was required to disclose all locations in Florida where ERMI stores DME and performs maintenance on its DME.

347.   ERMI, at the direction of Branch, represented in the AHCA Applications that all ERMI DME is stored and maintained at its licensed facility in Atlanta, Georgia.

348.   As part of the licensure process, the Florida AHCA must ensure that all facilities at which DME is stored and maintained in Florida are safe and sanitary and

---

[51] Ex. F-1.
[52] Ex. G-1.

that said facilities comply with the minimum standards required by Florida law. Thus, the identify of all such locations in Florida is material information that the Florida AHCA considers in deciding whether to issue a health care license to an out-of-state home medical equipment provider.

349.   The identities of all individuals who enter the homes of consumers in Florida to deliver DME is material information that must be disclosed to the Florida AHCA as part of the licensure process to ensure that out-of-state home medical equipment providers are not sending dangerous individuals into the homes of Florida consumers.

350.   In 2019, Relator, on behalf of and at the direction of ERMI and Branch, submitted an application for a second Florida AHCA license.

351.   The 2019 Florida AHCA License Application submitted by Relator was based on information provided to her by Branch and other members of ERMI leadership.

352.   Relator signed the 2019 AHCA Application on behalf of ERMI.

353.   At the time Relator signed the 2019 AHCA Application, she believed all representations and information provided therein to be true and correct.

354.   After Relator submitted the 2019 AHCA Application, she learned that much of the information provided to her by Branch and other members of ERMI leadership was false and/or misleading.

355.   After Relator submitted the 2019 AHCA Application, Relator learned that ERMI leadership, including Branch, had knowingly failed to provide her with pertinent material information regarding ERMI's use of facilities in Florida and the locations of such facilities as well as the identities of individuals working for and/or on behalf of ERMI and Branch in Florida.

356.   After signing and submitting the 2019 AHCA Application, Relator was shown pictures of rat and mold infested facilities in Florida at which ERMI's DME was being stored and repaired.

357.   As a result, Relator determined that the 2019 Florida AHCA License signed by her on behalf of ERMI contained multiple misrepresentations and omissions material to AHCA's evaluation thereof.

358.   Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations

generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that both the 2016 and 2019 Florida AHCA Licenses were procured fraudulently by misrepresenting and omitting material information from the AHCA Applications.

359.    The time periods from October 13, 2016 to October 12, 2018 and from November 1, 2019 until the filing of this action are collectively referred to as the "Fraudulent License Periods."

360.    Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two

dozen investor "road shows," Relator has firsthand personal knowledge of the fact that after ERMI was issued the 2019 Florida AHCA license, it submitted claims to the United States for payment or approval for DME provided to VA, OWCP, and Medicare patients in Florida during the Unlicensed Periods certifying falsely that the DME had been provided to said patients after the issuance of the 2019 Florida ACHA license.

361.  All claims presented by, on behalf of, and at the direction of ERMI to the United States for payment or approval for DME provided to patients in Florida during the Fraudulent License Periods certify that ERMI is in compliance with all applicable state regulatory rules and licensure requirements.

362.  The AHCA Applications submitted by ERMI at the direction of Branch represented falsely that all DME is shipped directly from Atlanta, Georgia to the homes of consumers in Florida.

363.  Based on Relator's work as ERMI's Chief Compliance Officer, her position of privilege from which she personally observed ERMI's billing and coding practices, her review of hundreds of invoices submitted to the United States for payment or approval, her review and knowledge of ERMI's internal medical research, her review and understanding of ERMI's financial reports and operations generally, her review and understanding of ERMI's financial reports and operations

specific to the Florida market, her daily interactions with members of ERMI's billing departments, her participation in weekly ERMI leadership meetings, her numerous discussions with key members of ERMI's leadership, and her attendance at over two dozen investor "road shows," Relator has firsthand personal knowledge of the fact that, notwithstanding the lack of a valid Florida AHCA license, ERMI has continued providing DME to consumers in Florida as well as submitting claims to Medicare, OWCP, and the VA for such DME.

**F.    Branch and ERMI Retaliate Against Relator for Trying to Do Her Job.**

364.    Within a month of Relator's November 2018 hiring, she began to see red flags regarding serious compliance issues.

365.    During a December 2018 meeting, Relator advised ERMI management to prepare for a potential audit.  Doug Easley (ERMI's National Sales Director) and Jennifer Wright (ERMI's Sales Director) responded by stating to Relator "it will all be over" if ERMI was audited again.

366.    In January 2019, ERMI hired Alissa B. Anderson ("Anderson") to work in its Compliance Department.

367.    Anderson reported directly to Relator.

368.    In July 2019, Anderson informed Relator that ERMI intended to fire Relator.

369.    On August 1, 2019, Relator learned that Branch was intentionally and deliberately interfering with her compliance efforts by preventing her from communicating truthful and accurate information to ERMI's regulatory counsel.

370.    Not wanting to inherit the role of Chief Compliance Officer at ERMI, Anderson resigned on August 9, 2019.

371.    Immediately after resigning, Anderson retained counsel to potentially represent her in any claims that she may have against ERMI.

372.    Rather than terminate Relator immediately and being left with no compliance department, ERMI and Branch agreed to continue to employ Relator through the end of 2019.

373.    Relator's agreement to remain at ERMI through the end of 2019 was contingent upon Branch supporting her efforts to bring ERMI into regulatory compliance.

374.    Absent Branch's support, Relator made it clear that there would be "repercussions" for forcing her out:

> You can fire me, if you see fit.  I serve at your pleasure.   There will be repercussions if I am fired- this is not a threat, it is my professional evaluation and prediction, and my personal indication. If you have any doubts here, I should and will explain the ramifications to you.

*See*, August 21, 2019 10:52 email from Relator to Branch and Ohman attached hereto as **Exhibit I**.

375.    Relator explained that she was making a promise, not a threat, and that there would be "repercussions" if ERMI did not make serious efforts to change the culture of the company and to become compliant.  Ex. I-2.

376.    As Chief Compliance Officer, Relator was responsible for ensuring outside counsel received accurate and truthful information.

377.    As part of Relator's efforts to ensure ERMI was in compliance and that truthful information was being conveyed to regulatory counsel, Relator instructed ERMI's management to copy her on all communications with regulatory counsel.

378.    In a deliberate and calculated attempt to thwart Relator's compliance efforts, Branch directed ERMI's regulatory counsel to only communicate with him and to do so only via telephone or text message.

379.    On August 24, 2019, Relator learned that Branch never intended for ERMI to comply with applicable laws and regulations.

380.    Rather, Relator learned that Branch had actually hired her as a ruse to fool potential investors into thinking ERMI had an actual compliance department and that it was concerned with obeying applicable laws and regulations.

381.  According to Branch, Relator's compliance "team was assembled to take over ERMI and prepare it for a capital transaction and for growth of the company." *See*, August 24, 2019 7:33 AM email from Thomas Branch attached hereto as **Exhibit J** at Ex. J-2.

382.  Relator was regularly and routinely bullied by Branch and other members of ERMI leadership, including ERMI's National Sales Director, Doug Easley.

383.  Branch continually ridiculed Relator during weekly ERMI leadership meetings by, among other things, accusing her of having an undiagnosed anxiety disorder, blaming her regulatory concerns on an undiagnosed anxiety disorder, and telling everyone in attendance that he needed to write her a prescription for antidepressants.

384.  In October 2019, Relator confided in Ohman that she was considering filing a whistleblower lawsuit against ERMI.

385.  Ohman represented to Relator that he was concerned and indicated that he would join her as party in a whistleblower lawsuit.

386.  Shortly after Relator's conversation with Ohman, during the week of October 21, 2019, Relator was instructed not to come into the office and to work from home.

387.  On Tuesday, October 22, 2019, Ohman informed Relator via telephone that her "resignation" was being accelerated.

388.  On October 22, 2019, Ohman informed Relater further that she would not be permitted to return to the office and that her personal belongings would be packed up and shipped to her.

389.  Since October 22, 2019, Relator has no longer been able to access ERMI's (a) document server; (b) claims and related files; (c) billing records; (d) financial documents and reports; or (e) or email server or her ERMI email account.

390.  While Relator is currently in possession of a few of ERMI's financial and operations review reports provided to her as a result of her position as Chief Compliance Officer, effectively immediately upon her termination, all other documents further establishing ERMI's knowing participation in multiple schemes to defraud the United States are in ERMI's exclusive possession, custody, and control.

391.  ERMI and Branch's actions leading up to the acceleration of Relator's resignation were orchestrated as part of a calculated plan to prevent Relator from accessing emails, bills, and other incriminating documents supporting a whistleblower lawsuit against ERMI and Branch.

392.   As part of Relator's termination, ERMI offered her a severance package.

393.   The severance package ERMI offered Relator included payment of a lump sum of money on the condition that Relator sign a general release of all claims, agree to keep confidential and not to disclose anything that she learned during her employment, and that she agree not to sue ERMI for any reason.

394.   Rather than accepting ERMI's money, Relator chose to do what she believed was the right thing to do and rejected ERMI's separation severance agreement and package so that she could pursue the instant whistleblower action.

## COUNT I - VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(a)(1)(A), "PRESENTMENT" FALSE CLAIMS BY DEFENDANTS BRANCH AND ERMI

### (Scheme 1: Sixteen Week Billing Program)

395.   Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-7 and 21-230 of this Third Amended Complaint as if fully restated and set forth herein.

396.   ERMI, at the direction of Branch, knowingly submits or causes to be submitted claims to the United States for payment or approval that are false in violation of 31 U.S.C. § 3729(a)(1)(A) as the result of ERMI's "16-Week Program" billing scheme whereby every single claim submitted by ERMI seeks payment for

16 weeks of DME usage despite ERMI's knowledge that the DME is not medically necessary during the entirety of the invoiced period.

397.   Because every claim submitted by, on behalf of, and at the direction of ERMI to the United States for payment or approval from January 2015 to July 2019 seeks payment for DME usage that ERMI knew was not medically necessary, every single such claim constitutes a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(A).

398.   As a direct and proximate result of the pattern and practice by ERMI and Branch of systematically presenting false or fraudulent claims to the United States for payment or approval for DME usage that ERMI knew was not medically necessary, the United States has suffered damages in the amount of no less than **$77,863,253.84** for false claims paid between January 2015 and July 2019.

399.   As a direct and proximate result of the pattern and practice by ERMI and Branch of systematically presenting false or fraudulent claims to the United States for payment or approval for a minimum of six (6) weeks during which ERMI and Branch knew ERMI's DME was not medically necessary, the United States is entitled to an award of treble damages in the amount of three (3) times its actual damages, being no less than **$233,589,761.52** plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

400.   As a direct and proximate result of the pattern and practice by ERMI and Branch of systematically presenting false or fraudulent claims to the United States for payment or approval for a minimum of six (6) weeks during which ERMI and Branch knew ERMI's DME was not medically necessary, the United States is also entitled to recover all costs incurred in pursuing this litigation against Defendants pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT II – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY DEFENDANTS ERMI AND BRANCH

### (Scheme 1: Sixteen Week Billing Program)

401.   Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-7 and 21-243 of this Third Amended Complaint as if fully restated and set forth herein.

402.   ERMI's internal research showing its DME is only medically necessary for up to 10 weeks is material information that ERMI was required to disclose to the United States to allow it to make an informed payment and eligibility determination.

403.   Between January 2015 and July 2019, ERMI knowingly failed to disclose material information showing that its DME is only medically necessary for up to 10 weeks to the United States with intent to induce the United States into

paying ERMI for at least six (6) weeks of usage during which ERMI DME was not medically necessary.

404.  As a result of ERMI's failure to disclose its internal research showing that its DME is only medically necessary for up to 10 weeks, the United States lacked sufficient information required to allow it to make an informed payment decision.

405.  Despite ERMI's knowing failure to disclose its internal research showing that its DME is only medically necessary for up to 10 weeks, it certified that it had provided the United States with sufficient information required to allow it to make an informed payment decision in every claim presented to the United States for payment or approval between January 2015 and July 2019.

406.  Because every CMS 1500 and 837P Form presented by ERMI seeks payment for 16 weeks of DME usage, every single claim presented by, at the direction of, and on behalf of ERMI between January 2015 and July 2019 certifies falsely that the United States has been provided with sufficient information required to allow it to make an informed payment decision.

407.  Because every CMS 1500 and 837P Form presented by ERMI seeks payment for 16 weeks of DME usage, every single claim presented by, at the direction of, and on behalf of ERMI between January 2015 and July 2019 certifies

falsely that the DME was medically indicated and necessary for the entire 16 weeks for which payment was sought and made.

408.  During the period of January 2015 to July 2019, ERMI and Branch knowingly made or used, or caused to be made or used, false records and/or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B), and payment of those false or fraudulent claims was a reasonable and foreseeable consequence of said statements by ERMI and Branch.

409.  ERMI and Branch knowingly made, used, or caused to made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B) for 16 weeks of DME usage by certifying falsely in all CMS 1500 and 837P Forms that federal healthcare programs had been provided with sufficient information required to allow the United States to make an informed eligibility and payment decision with intent to defraud the United States into paying for at least six (6) weeks of usage during which ERMI DME was not medically necessary.

410.  The United States relied to its detriment on ERMI and Branch's false certifications in all CMS 1500 and 837P Forms presented to the United States for

payment or approval by paying ERMI at least **$77,863,253.84** on false claims between January 2015 and July 2019.

411.  As a direct and proximate result of the false certifications made by ERMI and Branch in all CMS 1500 and 837P Forms presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered damages in the amount of no less than **$77,863,253.84** for false claims paid between January 2015 and July 2019.

412.  As a direct and proximate result of the false certifications made by ERMI and Branch in all CMS 1500 and 837P Forms presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(B), the United States is entitled to an award of treble damages in the amount of three (3) times its actual damages, being no less than **$233,589,761.52**, plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

413.  As a direct and proximate result of the false certifications made by ERMI and Branch in all CMS 1500 and 837P Forms presented to the United States in violation of 31 U.S.C. § 3729(a)(1)(B), the United States is entitled to recover all costs incurred in pursuing this litigation against Defendants pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT III – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(A), "PRESENTMENT" FALSE CLAIMS BY DEFENDANTS ERMI AND BRANCH**

**(Scheme 2: Concealment of "Best Prices")**

414.    Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-3, 8-11, 21-90, and 244-289 of this Third Amended Complaint as if fully restated and set forth herein.

415.    The existence, or non-existence, of previously assigned PDAC codes and reimbursement rates is material information that the VA and OWCP considers when negotiating reimbursement rates with DME supplies such as ERMI.

416.    ERMI's previously assigned PDAC codes and reimbursement rates assigned to its DME was material information that ERMI and Branch were required to disclose to the VA and OWCP.

417.    ERMI, by and through Branch, intentionally and knowingly failed to disclose and concealed from the VA and OWCP previously assigned PDAC codes and reimbursement rates assigned to its DME with the intent of inducing the VA and OWCP into paying higher rates than other payors.

418.    ERMI, by and through Branch, intentionally and knowingly failed to disclose PDAC codes and reimbursements rates previously assigned to ERMI DME with intent to deceive the VA and OWCP into believing there were no such codes or rates.

419.  ERMI, by and through Branch, intentionally and knowingly failed to disclose PDAC codes and reimbursements rates previously assigned to ERMI DME with intent to induce the VA and the OWCP into paying unreasonable and excessive rates for the its DME.

420.  The VA and OWCP relied to their detriment on ERMI and Branch's failure to disclose PDAC codes and reimbursements rates previously assigned to ERMI DME by agreeing to pay unreasonable and excessive rates for its DME.

421.  As a direct and proximate result of ERMI and Branch's intentional failure to disclose the PDAC codes and rates previously assigned to its DME, the VA and OWCP have been damaged by paying unreasonable and excessive rates for ERMI DME.

422.  Every claim submitted to the VA by ERMI and Branch was done so with the intent of inducing, and have in fact induced, the VA into paying excessive and unreasonable rates for ERMI's DME of up to $1,405.53 per unit provided to VA patients.

423.  Between January 2015 and July 2019, the United States paid ERMI over $57,855,411.09 on fraudulent claims charging excessive and unreasonable rates for DME provided to VA patients.  Ex. K-1.

424.    Based on a minimum of 9,970 claims submitted by ERMI to the United States for payment or approval between January 2018 and July 2019 for DME provided to VA patients, the United States overpaid ERMI for said DME in an amount of no less than **$14, 013,134.10**.  *See*, Ex. N and Ex. R.

425.    Every claim submitted to OWCP by ERMI and Branch was done so with intent to induce, and have in fact induced, OWCP into paying excessive and unreasonable rates for ERMI's DME of up to $2,800.19 per unit provided to OWCP patients.

426.    Between January 2018 and July 2019, the United States paid ERMI over $8,626,839.81 on fraudulent claims charging excessive and unreasonable rates for DME provided to OWCP patients.  Ex. O and Ex. S.

427.    Based on a minimum of 2,498 claims submitted by ERMI to the United States for payment or approval between January 2018 and July 2019for DME provided to OWCP patients, the United States overpaid ERMI for said DME in an amount of no less than **$6,994,874.62**.  *See*, Ex. O and Ex. S.

428.    Pursuant to 31 U.S.C. § 3729(a)(1)(A), all claims presented to the VA and OWCP for payment or approval based on ERMI and Branch's failure to disclose previously assigned PDAC codes and reimbursements rates constitutes a separate false or fraudulent claim.

429.  As a direct and proximate result of the false or fraudulent claims presented by ERMI and Branch to the VA and OWCP for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered damages in tanhe amount of no less than **$66,482,250.90**, representing the amount paid by the United States on ERMI's fraudulent claims submitted between January 2015 and July 2019 for DME provided to VA patients ($57,855,411.09) and OWCP patients ($8,626,839.81).

430.  As a direct and proximate result of the false or fraudulent claims presented by ERMI and Branch to the VA and OWCP for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), the United States has suffered damages in at least an amount equal to the difference between the unreasonable and excessive rates paid on ERMI's fraudulent claims submitted between January 2015 and July 2019 for DME provided to VA and OWCP patients and the amount ERMI charges Medicare patients for the same DME, such amount being no less than **$21,008,008.72**

431.  As a direct and proximate result of the false or fraudulent claims presented by ERMI and Branch to the VA and OWCP for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), the United States is entitled to an award of treble damages in an amount of no less than **$199,446,752.70**, said amount

representing three (3) times the minimum amount paid by the United States to ERMI between January 2015 and July 2019 for DME provided to VA patients and OWCP patients, plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

432.  As a direct and proximate result of the false or fraudulent claims presented by ERMI and Branch to the VA and OWCP for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), the United States is entitled to an award of treble damages in an amount equal to at least three (3) times the amount of unreasonable and excessive rates it paid ERMI between January 2015 and July 2019 (**$21,008,008.72**), being no less than **$63,024,026.16** plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

433.  As a direct and proximate result of the false or fraudulent claims presented by ERMI and Branch to the VA and OWCP for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A), the United States is entitled to recover all costs incurred in pursuing this litigation against ERMI and Branch pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT IV – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE CERTIFICATIONS BY ERMI AND BRANCH

### (Scheme 2: Concealment of "Best Prices")

434. Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-3, 8-11, 21-90, 231-243, and 244-289 of this Third Amended Complaint as if fully restated and set forth herein.

435. ERMI and Branch knowingly made, used, or caused to be made or used, false records and/or statements that were material to claims for payment or approval to the United States for DME in violation of 31 U.S.C. § 3729(a)(1)(B) and, as a result of said false records and/or statements, the United States paid said claims. Specifically, the VA and OWCP United States paid ERMI based on false records and/or statements that intentionally and knowingly failed to disclose previously assigned PDAC codes and rates.

436. ERMI, at the direction of Branch, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B) by certifying falsely in all claims for DME supplied to VA and OWCP patients that said claims were accurate, complete, and truthful with intent to defraud the United States.

437.    ERMI, at the direction of Branch, knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B) by certifying falsely in all claims for DME supplied to VA and OWCP patients that the United States had been provided with sufficient information required to allow it to make an informed eligibility and payment decision with intent to defraud the United States.

438.    The United States relied to its detriment on knowingly false certifications made by and at the direction of ERMI and Branch in violation of 31 U.S.C. § 3729(a)(1)(B) by paying unreasonable and excessive rates for DME provided to VA and OWCP patients.

439.    As a direct and proximate result of ERMI and Branch's knowingly false certifications on all claims presented to the United States for DME supplied to VA and OWCP patients in violation of 31 U.S.C. § 3729(a)(1)(B), the United States has suffered damages in an amount of no less than **$66,482,250.90**, said amount representing the amount paid by the United States between January 2015 and July 2019 as a result of ERMI's knowingly false certifications regarding DME provided to VA patients ($57,855,411.09) and OWCP patients ($8,626,839.81).

440.    As a direct and proximate result of ERMI and Branch's knowingly false certifications on all claims presented to the United States for DME supplied to VA and OWCP patients in violation of 31 U.S.C. § 3729(a)(1)(B), the United States is entitled to an award of treble damages in an amount of no less than **$199,446,752.70**, said amount representing three (3) times the minimum amount paid by the United States to ERMI between January 2015 and July 2019 as a result of ERMI's knowingly false certifications regarding DME provided to VA patients and OWCP patients, plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

441.    As a direct and proximate result of ERMI and Branch's knowingly false certifications on all claims presented to the United States for DME supplied to VA and OWCP patients in violation of 31 U.S.C. § 3729(a)(1)(B), the United States is entitled to recover all costs incurred in pursuing this litigation against ERMI and Branch pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT V – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY ERMI AND BRANCH

### (Scheme 3: Unlicensed Activity in Florida)

442.    Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-3, 12-20, 231-243, and 290-341 of this Third Amended Complaint as if fully restated and set forth herein.

443.    During the Unlicensed Activity Periods, ERMI, at the direction of Branch, knowingly provided, supplied, and distributed DME to the homes of consumers in Florida without the requisite AHCA license, valid or invalid.[53]

444.    ERMI and Branch knowingly certified falsely in all claims presented to the United States for payment or approval during the Unlicensed Activity Periods that ERMI provided DME to consumers in Florida in accordance with all applicable Florida laws and regulations, including Florida's licensure requirements, with intent to defraud United States into paying all such claims.

445.    The United States relied to its detriment on the knowingly false certifications by ERMI and Branch that ERMI was in compliance with all applicable state licensure requirements, including Florida's licensure requirements, by paying ERMI's claims for DME provided during the Unlicensed Activity Periods to consumers in Florida and by not revoking ERMI's Medicare billing privileges.

446.    ERMI's violations of Florida's licensing requirement were not merely technical.    Rather, ERMI's violations of Florida's licensing requirement were committed knowingly and intentionally and were part of a deliberate scheme to evade AHCA oversight.

---

447.   By valuing money over all else, ERMI recklessly endangered the health and safety of Florida consumers.

448.   *Every single claim* presented by, at the direction of, and on behalf of ERMI for DME provided to consumers in Florida during the Unlicensed Activity Periods contained knowingly false certifications material to false or fraudulent claims which were intended to, and did in fact, defraud the United States.

449.   During the Unlicensed Activity Periods, ERMI, at the direction of Branch, knowingly and intentionally submitted or caused to be submitted claims for payment or approval to the United States for DME provided to patients in Florida certifying falsely that ERMI was in compliance with all applicable laws and regulations as a result of ERMI's unlicensed activities in the State of Florida.

450.   As a result of ERMI's false certifications regarding DME provided to consumers in Florida during the Unlicensed Activity Periods, ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

451.   *Every single claim* presented by, at the direction of, and on behalf of ERMI and Branch during the Unlicensed Activity Periods constitutes a false record

or statement material to a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

452.   ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval for all DME provided to consumers in Florida during the Unlicensed Activity Periods in violation of 31 U.S.C. § 3729(a)(1)(B) by certifying falsely that ERMI was in compliance with all state laws and regulatory requirements with intent to defraud the United States into paying said claims.

453.   ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Unlicensed Activity Periods in violation of 31 U.S.C. § 3729(a)(1)(B) by concealing and/or failing to disclose the fact that said claims were tainted by unlicensed conduct with intent to defraud the United States into paying said claims.

454.   As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Unlicensed Activity Periods, the United States has suffered damages in an amount equal to the amount paid to ERMI from January 1,

2015 to October 12, 2016 and October 13, 2018 to October 31, 2019 on claims for DME provided to patients in Florida.

455.  As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Unlicensed Activity Periods, the United States is entitled to an award of treble damages in an amount equal to three (3) times the amount paid to ERMI from January 1, 2015 to October 12, 2016 and October 13, 2018 to October 31, 2019 on claims for DME provided to patients in Florida, plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

456.  As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Unlicensed Activity Periods, the United States is entitled to recover all costs incurred in pursuing this litigation against Defendants pursuant to 31 U.S.C. § 3729(a)(3).

**COUNT VI – VIOLATION OF FALSE CLAIMS ACT, 31 U.S.C. § 3729(A)(1)(B), "MAKE-OR-USE" FALSE RECORDS AND STATEMENTS MATERIAL TO FALSE CLAIMS BY ERMI AND BRANCH**

**(Scheme 3: Fraudulent Activity in Florida)**

457.    Plaintiff United States of America and Relator hereby incorporate by reference Paragraphs 1-3, 12-20, 231-243, 290-318, and 342-363 of this Third Amended Complaint as if fully restated and set forth herein.

458.    ERMI and Branch knew at the time ERMI submitted the 2016 and 2019 Florida AHCA Applications that ERMI's representations that all DME was shipped directly from Atlanta, Georgia was false.  Namely, ERMI and Branch knew that ERMI stored DME in multiple locations in Florida, including garages and storage units, as part of ERMI's regular Florida operations.

459.    Whether an applicant stores DME at locations in Florida or ships DME from out-of-state facilities directly to the homes of consumers in Florida is material information that the Florida AHCA considers in deciding to issue a home medical equipment provider such as ERMI a health care license.

460.    ERMI and Branch intentionally misrepresented in the 2016 and 2019 Florida AHCA Applications that all DME was shipped directly from Atlanta, Georgia to the homes of consumers in Florida with intent to conceal the actual

locations in Florida at which ERMI regularly stored DME and prevent inspection of such locations.

461.  ERMI and Branch's intentional misrepresentations in the 2016 and 2019 Florida AHCA Applications that all DME was shipped directly from Atlanta, Georgia to the homes of Florida consumers were material information that the Florida AHCA relied upon in deciding to issue ERMI the 2016 and 2019 AHCA Licenses.  Namely, the Florida AHCA would not have issued either the 2016 or 2019 License without first inspecting these locations and likely would not have issued the licenses had it inspected such locations.

462.  The Florida AHCA relied to its detriment on ERMI's material misrepresentations in the 2016 and 2019 Florida AHCA Applications that all DME was shipped directly from Atlanta, Georgia to the homes of consumers in Florida by issuing the Licenses without inspecting the facilities in Florida at which ERMI regularly stored DME.

463.  ERMI and Branch knew at the time ERMI submitted the 2016 and 2019 Florida AHCA Applications that ERMI's representations that all DME was stored and maintained in Atlanta, Georgia was be false.  Namely, ERMI and Branch knew that ERMI stored and performed maintenance on DME at unlicensed facilities, including garages and storage units, in Florida.

464.  ERMI and Branch knowingly misrepresented in the 2016 and 2019 Florida AHCA Applications that all DME was stored and maintained at its licensed facility in Atlanta, Georgia with intent to mislead the Florida AHCA into issuing ERMI home medical equipment provider licenses without inspecting the actual facilities in Florida at which ERMI was storing and performing maintenance on DME.

465.  ERMI and Branch's intentional misrepresentations in the 2016 and 2019 Florida AHCA Applications that all DME was stored and maintained in Atlanta, Georgia were material information that the Florida AHCA relied upon in deciding to issue ERMI the 2016 and 2019 AHCA Licenses.  Namely, the Florida AHCA would not have issued either the 2016 or 2019 License without inspecting the facilities in Florida at which ERMI was storing and performing maintenance on DME.

466.  The Florida AHCA relied to its detriment on ERMI's material misrepresentations in the 2016 and 2019 Florida AHCA Applications that all DME was stored and maintained in Atlanta, Georgia by issuing ERMI the 2016 and 2019 AHCA Licenses without inspecting the Florida facilities at which ERMI was storing and performing maintenance on DME.

110

467.    ERMI and Branch knew at the time ERMI submitted the September 2016 Florida AHCA Application that ERMI's representations that it had no employees in Florida and "no delivery personnel hired as yet" were false.

468.    ERMI and Branch intentionally misrepresented in the September 2016 Florida AHCA Application that EMI had no employees in Florida and "no delivery personnel hired as yet" with intent to defraud AHCA by concealing the identities of delivery personnel who ERMI and Branch knew or feared could not pass the required background check.

469.    ERMI and Branch intentionally misrepresented and omitted material information from the 2016 and 2019 Florida AHCA Applications regarding ERMI personnel in Florida, including delivery personnel, by concealing the identifies of delivery personnel in Florida who they believed or feared could not pass the requisite background check.

470.    The Florida AHCA relied to its detriment on ERMI's misrepresentations and omissions of material information regarding delivery personnel in Florida in the 2016 and 2019 Florida AHCA Applications by issuing ERMI licenses in 2016 and 2019 without performing the required background checks on all such individuals.

471.   As part of the 2019 AHCA Applications, Branch intentionally failed to disclose to, and withheld from, Relator the names of certain individuals working for and/or on behalf of ERMI in Florida who Branch and ERMI knew could not pass the required level 2 background check.

472.   ERMI intentionally misrepresented in the 2019 AHCA license application that all DME is stored and all maintenance is performed thereon in Atlanta, Georgia to prevent AHCA from inspecting facilities in Florida, including the rat and mold infested facilities, at which maintenance on ERMI DME was being performed.

473.   ERMI's intentional misrepresentation in the 2019 AHCA Application that all DME is stored and all maintenance is performed thereon in Atlanta, Georgia was material to AHCA's approval and issuance of the 2019 license.  Namely, AHCA did not inspect the legally inadequate facilities in Florida where ERMI DME is stored and repaired.

474.   AHCA relied to its detriment on ERMI and Branch's material misrepresentation in the 2019 AHCA Application that all DME is stored and all maintenance is performed thereon in Atlanta, Georgia by granting the 2019 license despite the fact ERMI DME was being stored and repaired at unsafe and unsanitary

locations in Florida that did not meet the minimum standards required by Florida law.

475.   During the entire Fraudulent License Periods, Branch and ERMI knew that ERMI was not in compliance with Florida's regulatory rules and licensure requirements.

476.   ERMI and Branch's misrepresentations and omissions of material information in the 2016 and 2019 Florida AHCA Applications were not merely technical.  Rather, these misrepresentations and omissions were made by ERMI and Branch knowingly and intentionally pursuant to a deliberate scheme to evade AHCA oversight and defraud it into issuing ERMI two licenses.

477.   By valuing money over all else, ERMI and Branch recklessly endangered the health and safety of Florida consumers.

478.   *Every single claim* presented by, at the direction of, and on behalf of ERMI for DME provided to consumers in Florida during the Fraudulent License Periods contained knowingly false certifications material to false or fraudulent claims which were intended to, and did in fact, defraud the United States.

479.   During the Fraudulent License Periods, ERMI, at the direction of Branch, knowingly and intentionally submitted or caused to be submitted claims for payment or approval to the United States for DME provided to patients in Florida

certifying falsely that ERMI was in compliance with all applicable laws and regulations as a result of ERMI's unlicensed activities in the State of Florida.

480.    As a result of ERMI's false certifications regarding DME provided to consumers in Florida during the Fraudulent License Periods, ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

481.    *Every single claim* presented by, at the direction of, and on behalf of ERMI and Branch during the Fraudulent License Periods constitutes a false record or statement material to a false or fraudulent claim for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(B).

482.    ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the United States for payment or approval for all DME provided to consumers in Florida during the Fraudulent License Periods in violation of 31 U.S.C. § 3729(a)(1)(B) by certifying falsely that ERMI was in compliance with all state laws and regulatory requirements with intent to defraud the United States into paying said claims.

483.    ERMI and Branch knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims presented to the

114

United States for payment or approval for all DME provided to patients in Florida during the Fraudulent License Periods in violation of 31 U.S.C. § 3729(a)(1)(B) by concealing and/or failing to disclose the fact that said claims were tainted by unlicensed conduct with intent to defraud the United States into paying said claims.

484.   As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Fraudulent License Periods, the United States has suffered damages in an amount equal to the actual amount paid to ERMI on claims for DME provided to Florida Residents between October 13, 2016 and October 12, 2018 and from November 1, 2019 to the present.

485.   As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Fraudulent License Periods, the United States is entitled to an award of treble damages in an amount equal to three (3) the actual amount paid to ERMI on claims for DME provided to Florida Residents between October 13, 2016 and October 12, 2018 and from November 1, 2019 to the present, plus statutory penalties pursuant to 31 U.S.C. §§ 3729(a)(1).

115

As a direct and proximate result of Branch and ERMI's intentional and knowing conduct in violation of 31 U.S.C. § 3729(a)(1)(B) regarding claims presented to the United States for payment or approval for all DME provided to patients in Florida during the Fraudulent License Periods, the United States is entitled to recover all costs incurred in pursuing this litigation against Defendants pursuant to 31 U.S.C. § 3729(a)(3).

## COUNT VII – VIOLATIONS OF FALSE CLAIMS ACT, 31 U.S.C. § 3730(H), RETALIATION BY ERMI AND BRANCH

### (Retaliation against Cooley)

486.   Plaintiff Cooley hereby incorporates by reference Paragraphs 1 through 485 of this Third Amended Complaint as if fully restated and set forth herein.

487.   ERMI threatened, harassed, and ultimately terminated Relator because of her efforts to bring ERMI into compliance with applicable state and federal rules, regulations, and policies and her threat to bring a whistleblower case against ERMI and Branch if they did not let her do her job.

488.   ERMI and Branch's actions leading up to the acceleration of Relator's resignation were orchestrated as part of a calculated plan to prevent Relator from accessing emails, bills, and other incriminating documents of their illegal conduct that she could use to support a whistleblower lawsuit against ERMI and Branch.

116

489.    ERMI and Branch's actions in terminating Relator for trying to do her job as Chief Compliance Officer and their efforts to coerce her into releasing any and all claims that she may have had and obtaining her covenant not to sue ERMI are in violation of 31 U.S.C. § 3729.

490.    Relator was discharged, suspended, threatened, and harassed against in the terms and conditions of her employment as ERMI's Chief Compliance Officer because of her lawful acts in furtherance of her efforts to stop ERMI and Branch's conduct in violation of 31 U.S.C. § 3729.

491.    As a direct and proximate result of ERMI and Branch's retaliation against Relator for her lawful acts in furtherance of her efforts to stop their conduct in violation of 31 U.S.C. § 3729, Relator has been damaged.

492.    As a direct and proximate result of ERMI and Branch's retaliation against Relator for her lawful acts in furtherance of her efforts to stop their conduct in violation of 31 U.S.C. § 3729, Relator is entitled to recover two times the amount of back-pay she has lost, prejudgment interest, special damages and attorneys' fees.

## IX.    JURY TRIAL DEMANDED

493.    Relator demands a trial by an impartial jury of her peers.

## X.  <u>PRAYER FOR RELIEF</u>

WHEREFORE Plaintiff/Relator, acting on behalf of and in the name of the United States, demands and prays that judgment be entered in favor of the United States against each Defendant, jointly and severally, as follows:

(a)    The amount of the United States' damages in an amount to be proven at trial;

(b)    Treble the amount of the United States' damages in an amount to be proven at trial;

(c)    Civil penalties for each false claim submitted;

(d)    Reasonable costs and attorney's fees; and

(e)    Any such other and further relief deemed just and proper by this Court.

This 3rd day of February, 2023.

COCHRAN & EDWARDS, LLC
2950 Atlanta Road SE
Smyrna, Georgia 30080-3655
(770) 435-2131
(770) 436-6877 (*fax*)
randy@cochranedwardslaw.com
paul@cochranedwardslaw.com

THE LAW FIRM OF LAWANDA HODGES, LLC
1100 Peachtree Street, Suite 200
Atlanta, Georgia 30309
(404) 474-0772
(404) 474-2774
lhodges@lhodgeslaw.com

/s/ *Paul A. Piland*
R. Randy Edwards
Georgia Bar No. 241525
Paul A. Piland
Georgia Bar No. 558748

/s/ *Lawanda N. Hodges*
Lawanda N. Hodges
Georgia Bar No. 547413

119

## <u>LOCAL RULE 7.1D CERTIFICATION</u>

By signature below, counsel certifies that the foregoing document was prepared in Times New Roman, 14-point font in compliance with Local Rule 5.1B.

*/s/ Paul A. Piland*

Paul A. Piland
Georgia Bar No. 558748

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on this day, I have electronically filed the within and foregoing **<u>THIRD AMENDED COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729, <i>ET SEQ.</i></u>** with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to the following attorneys of record:

> Robert M. Brennan
> Jameson B. Bilsborrow

*/s/ Paul A. Piland*

R. Randy Edwards
Georgia Bar No. 241525
Paul A. Piland
Georgia Bar No. 558748

121