IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA ex rel.
ELIZABETH A. COOLEY,

     Plaintiff,

         v.

ERMI, LLC f/k/a ERMI, INC., et al.,

     Defendants.

CIVIL ACTION FILE
NO. 1:20-CV-4181-TWT

**OPINION AND ORDER**

This is an action brought under the False Claims Act. It is before the

Court on the Defendants' Partial Motion to Dismiss Third Amended Complaint

[Doc. 62]. For the reasons set forth below, the Defendants' Partial Motion to

Dismiss Third Amended Complaint [Doc. 62] is GRANTED in part and

DENIED in part.

## I.   Background

This case arises from an alleged fraud orchestrated against federal

healthcare programs to the tune of tens of millions of dollars. The relator,

Elizabeth Cooley, alleges that for years, her former employer, ERMI, LLC,[1]

and its controlling manager, Thomas P. Branch, billed the United States for

durable medical equipment ("DME") that was medically unnecessary,

---

[1] Defendants ERMI, LLC and End Range of Motion Improvement, Inc.
are collectively referred to as "ERMI."

overpriced, or not in compliance with state healthcare regulations. The pertinent facts and procedural history of this action have been spelled out in the Court's previous orders. *See, e.g.*, *United States ex rel. Cooley v. ERMI, LLC*, 2022 WL 4715679 (N.D. Ga. Sept. 30, 2022) (the "September 2022 Order"); *United States ex rel. Cooley v. ERMI, LLC*, 2022 WL 1185155 (N.D. Ga. Apr. 21, 2022). Twice before, the Court has dismissed large portions of Cooley's complaints: the first time on shotgun pleading grounds and the second time for failure to plead her fraud claims with particularity under Federal Rule of Civil Procedure 9(b). On February 2, 2023, the Court granted Cooley leave to file the Third Amended Complaint that is the subject of the Defendants' current motion to dismiss.

The Third Amended Complaint abandons two of the five fraudulent schemes alleged in Cooley's earlier complaints—the Illegal Kickback Scheme and the Illegal Self-Referral Scheme—while attempting to strengthen the factual foundation for the remaining schemes—the 16-Week Billing Scheme, the Concealment of Best Prices Scheme, and the Florida Licensing Scheme. For each scheme, Cooley asserts that the Defendants committed two violations of the False Claims Act: (1) presenting false or fraudulent claims for payment under 31 U.S.C. § 3729(a)(1)(A) and (2) making false statements that are material to a false or fraudulent claim under 31 U.S.C. § 3729(a)(1)(B). Cooley also alleges that ERMI violated the False Claims Act's retaliation provision, 31 U.S.C. § 3730(h), by threatening, harassing, and eventually terminating her

after she threatened to bring a whistleblower lawsuit. Notwithstanding the new facts in the Third Amended Complaint, the Defendants now renew their arguments to dismiss Cooley's fraud-based claims.

## II.   Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Fed. R. Civ. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, though, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. *See Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983); *Sanjuan v. American Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (noting that the plaintiff "receives the benefit of imagination" at the pleading stage). Generally, notice pleading is all that is required for a valid complaint. *See Lombard's, Inc. v. Prince Mfg., Inc.*, 753 F.2d 974, 975 (11th Cir. 1985). Under notice pleading, the plaintiff need only give the defendant fair notice of his claims and the grounds upon which they rest. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007).

### III.   Discussion

In this latest motion to dismiss, the Defendants advance many of the same arguments under Rules 9(b) and 12(b)(6) as they did in their earlier motions. The Court first addresses whether the allegations in the Third Amended Complaint, unlike in its predecessor, comply with Rule 9(b)'s particularity requirement. As necessary, the Court next considers whether Cooley's claims are foreclosed by the claim-specific issues raised in the motion.

### A. Rule 9(b) Particularity Requirement

As explained in the September 2022 Order, an action brought under the False Claims Act is rooted in fraud and must be pled with particularity to survive dismissal under Rule 9(b). *See Cooley*, 2022 WL 4715679, at 3. There are two ways for a relator to meet this heightened pleading standard. The first is to reference specific billing information such as dates, times, and amounts of actual false claims that were submitted to the government. The second is to allege direct knowledge of the defendants' submission of false claims based on the relator's own experiences and on information that she learned in the course of her employment. *See id.* at *4. Even when a relator opts for this second method, she "still must allege *specific details* about false claims to establish the indicia of reliability necessary under Rule 9(b)." *See Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1276 (11th Cir. 2018) (emphasis added) (quotation marks and citation omitted).

At no point in her series of complaints, including in the Third Amended Complaint, has Cooley identified a single specific example of a false claim by date, amount, claim number, patient, or otherwise. *See id.* She instead relies on her personal knowledge of the Defendants' fraudulent activities to satisfy the particularity requirement. (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, at 2-3 (citation omitted).) Thus far, Cooley's personal knowledge has not been enough to carry her fraudulent-billing claims past the pleading stage. In the September 2022 Order, the Court explained that although Cooley may have identified suspicious behavior within ERMI, she failed to allege direct knowledge as to how, when, or even if that behavior translated into the submission of false claims. *See Cooley*, 2022 WL 4715679, at *6. With respect to the 16-Week Billing Scheme, the Court noted:

> Cooley never observed, much less participated in, the submission of a fraudulent claim; she was not tasked as [Chief Compliance Officer] with overseeing ERMI's billing functions or reviewing individual claims on the government; and she never had conversations with anyone in ERMI's billing department (as opposed to a salesperson) about its billing policies.

*Id.* The Concealment of Best Prices Scheme suffered from the same general defect. The sole factual basis for this scheme was a conversation in which Branch admitted to charging the VA and the OWCP higher rates for DME than Medicare. However, by her own allegations, Cooley had neither observed nor participated in the submission of an improperly coded claim to either program. *See id.* at *7. Finally, the Florida Licensing Scheme failed because Cooley did

5

not adequately allege the existence of any federal claims for Florida patients during the relevant time period. *See id.*

Cooley insists that the Third Amended Complaint should resolve concerns about whether she has the insider knowledge to speak to each fraudulent scheme. The Court is not entirely persuaded. As explained below, although she has bolstered her factual allegations in part, Cooley continues to depend on generalities and supposition to make out most of her fraudulent-billing claims. Eleventh Circuit precedent is clear: a relator cannot simply attest to having personal knowledge of false claims and then fail to disclose any specific details about those claims. *See, e.g.*, *Carrel*, 898 F.3d at 1278 ("Indeed, that the relators supposedly had access to pertinent data and still were unable to pinpoint specific false claims . . . suggests that they lack any meaningful personal knowledge or participation in the fraudulent conduct." (quotation marks and citation omitted)); *Est. of Helmly v. Bethany Hospice & Palliative Care of Coastal Ga., LLC*, 853 F. App'x 496, 502 (11th Cir. 2021) ("[E]ven with direct knowledge of the defendants' billing and patient records, Relators have failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims." (quotation marks and citation omitted)).

Beginning with the 16-Week Billing Scheme, Cooley alleges that she performed a "denials management" investigation to determine why so many of

ERMI's Medicare claims were being denied and to implement measures for reducing the volume of denials. (Third Am. Compl. ¶¶ 96-101.) She eventually expanded that investigation to claims denied by the VA and the OWCP. (*Id.* ¶ 105.) During this process, Cooley "personally reviewed" claims that had been paid by government programs such as Medicare and the VA. (*Id.* ¶¶ 112-13, 115.) She "discovered" that all claims submitted by ERMI for every single patient sought payment for 16 weeks of DME usage, and she confirmed this billing practice with ERMI management, including the head of the company's billing department. (*Id.* ¶¶ 132-33, 141-42, 181-82.) Cooley also repeats allegations that ERMI forged physician signatures on prescriptions and ignored some prescriptions altogether to ensure that it could bill the United States for 16 weeks. (*Id.* ¶¶ 173-78.) And she reiterates that ERMI ignored requests from patients to pick up DME before the 16 weeks were up. (*Id.* ¶¶149-59.)

Even with all of this professed insider knowledge, the shortcomings in Cooley's earlier complaints persist in the Third Amended Complaint. As the Court explained in the September 2022 Order:

> [Cooley] is unable to name a single patient whose request to retrieve DME early went unanswered, or a single sales representative who advised writing 16-week prescriptions, or a single doctor whose shorter prescriptions were altered or ignored. This raises serious red flags in the Court's mind: that despite her alleged insight into ERMI's billing practices, Cooley cannot offer precise facts pointing to even one example of a false claim.

*Cooley*, 2022 WL 4715679, at *5 (citation omitted). This time, Cooley assures that she actually reviewed claims that were paid by the government—yet she offers no details about the content of those claims or their overall composition (e.g., the time period in which they were submitted). The Court is unwilling to give Cooley "a ticket to the discovery process" on such generalized allegations. *United States ex rel. Clausen v. Lab'y Corp. of Am., Inc.*, 290 F.3d 1301, 1307 (11th Cir. 2002). As this Court observed two decades ago, the particularity requirement not only protects defendants against strike suits, but also ensures that False Claims Act cases will have discernable boundaries and manageable discovery limits. *See United States ex rel. Clause v. Lab'y Corp. of Am., Inc.*, 198 F.R.D. 560, 564 (N.D. Ga. 2000). As pled, the 16-Week Billing Scheme is boundless. Cooley alleges that *every single claim* presented by ERMI between January 2015 and July 2019 was fraudulent, and she will presumably ask ERMI to produce each one of those claims if her case is allowed to proceed. (Third Am. Compl. ¶¶ 397, 406-07.) But other allegations in the Third Amended Complaint caution against such broad discovery. For example, Cooley admits that the United States *denied* some of ERMI's claims on medical necessity grounds—that is, because the United States determined that the DME was not, or was no longer, medically necessary. (*Id.* ¶ 137.) The implication is that the United States paid other claims after determining that the DME *was* necessary for the full 16 weeks. To the extent that ERMI forged or ignored some prescriptions, Cooley offers no clues as to when or how often

8

that behavior occurred; how many claims were involved; which employees, doctors, or patients were implicated; or any other facts to help narrow the scope of discoverable information. Perhaps most concerning, Cooley's medical-necessity contentions are based entirely on vague "internal medical research" that she has never been able to identify or describe in any detail.[2] (*Id.* ¶¶ 160-172.) In short, a fishing expedition would be sure to follow without strict enforcement of Rule 9(b) in this case.

Cooley asks the Court to forgive this lack of specificity because the Defendants barred her from accessing ERMI's records as soon as she mentioned a whistleblower lawsuit. (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, at 3.) Quoting *United States ex rel. McNutt v. Haleyville Medical Supplies, Inc.*, 423 F.3d 1256 (11th Cir. 2005), Cooley argues that "courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." (*Id.*) There are two problems with this argument. The first is that the above *McNutt* quotation does not actually appear in *McNutt* or in any other opinion from the Eleventh Circuit. The second is that Cooley lost access to ERMI's billing records and

---

[2] The Third Amended Complaint's reference to an ERMI marketing brochure is unavailing. (Third Am. Compl. ¶¶ 50-51 & Ex. A at A-6, -8.) The brochure simply describes study results showing the average patient's improvement using ERMI DME over a multi-week period. It does not suggest that patients do not continue to experience improvements when the DME is used for longer periods of time.

other files at most one day before her termination. (Third Am. Compl. ¶¶ 384-91.) Accordingly, the Court believes that this case continues to resemble the likes of *Carrel* and especially *Estate of Helmly*, as discussed in the September 2022 Order.[3] *See Est. of Helmly*, 853 F. App'x at 498, 501-02 (dismissing a complaint under Rule 9(b) where the relators allegedly confirmed the submission of false claims from their review of billing records, attendance at management meetings, and conversations with the defendants' employees).

The Concealment of Best Prices Scheme is beset with the same problems. Cooley alleges that ERMI charged the VA and the OWCP significantly higher rates for DME than it did Medicare. However, the basis for this allegation is not the content of any individual claims submitted to the government, but average prices that Cooley calculated from ERMI's overall revenue and claim figures. (Third Am. Compl. ¶¶ 247-56.) For example, Cooley asserts that ERMI charged OWCP patients $2,967.09 per unit of DME in 2018; she came up with that number after dividing the total amount paid by the OWCP ($6,210,134.72) by the total number of claims (2,093). (*Id.* ¶¶ 253-54.) These averages may be the product of "elementary arithmetic," as the Third Amended Complaint calls it, but they do not provide the kind of identifying

---

[3] Cooley urges the Court to follow the lead of a Florida district court in *United States ex rel. Napoli v. Premier Hospitalists PL*, 2017 WL 119773 (M.D. Fla. Jan. 12, 2017). Beyond the fact that *Napoli* is not binding on this Court, it was decided before both *Carrel* and *Estate of Helmly* and is thus entitled to even less weight than it otherwise would be.

claim information demanded by Rule 9(b). *See, e.g.*, *United States v. Lee Memorial Health Sys.*, 2019 WL 1061113, at *5 (M.D. Fla. Mar. 6, 2019) (exhibits showing a hospital's total Medicare billing data did not satisfy Rule 9(b) absent "identifying claim information," such as "how many of the total claims were false"). As the Eleventh Circuit advised in *United States ex rel. Mastej v. Health Management Associates, Inc.*, 591 F. App'x 693, 708 (11th Cir. 2014), where a False Claims Act case is based on medical services that were "unnecessary, overcharged, or miscoded," "representative claims with particularized medical and billing content matter more[.]" The allegations for the Concealment of Best Prices Scheme fall short of this standard.[4]

The Florida Licensing Scheme presents a different story. Cooley alleges that ERMI falsely certified to the United States that it was complying with Florida healthcare regulations when in reality, it operated there with either no state license or a fraudulently obtained license since 2015. (Third Am. Compl. ¶¶ 321-27, 343-60.) Unlike the prior two schemes, this one does not depend on "the particularized medical or billing content of any given claim form." *Mastej*, 591 F. App'x at 708. In other words, "the type of medical service rendered and described in [a claim], the billing code, or what was charged for

---

[4] The Court need not repeat its discussion of allegations that were already addressed in the September 2022 Order—namely Branch's admission that ERMI charged the VA and the OWCP higher rates than Medicare. *See Cooley*, 2022 WL 4715679, at *6-7.

that service are not the underlying fraudulent acts." *Id.* at 708. Those details
need not be alleged with particularity, then, to satisfy Rule 9(b). *See id.* at 709
("A plaintiff must satisfy Rule 9(b) with respect to the circumstances of the
fraud he alleges—but not as to matters that have no relevance to the
fraudulent acts."). Instead, Cooley must, at a minimum, demonstrate that
ERMI submitted claims to federal payors for Florida patients while it was not
properly licensed in the state.

In the September 2022 Order, the Court faulted Cooley for using
mathematical probability to show that ERMI must have submitted a false
claim in Florida at some point. *See Cooley*, 2022 WL 4715679, at *7.
Specifically, she alleged that Florida is ERMI's largest market for gross
revenue and Medicare dollars and that approximately 20 percent of Florida's
population is eligible for Medicare. In the Third Amended Complaint, Cooley
corrects this pleading defect with respect to some, but not all, federal payors
and time periods. She attaches financial records showing that ERMI submitted
2,627 and 227 claims in Florida to the VA and the OWCP, respectively,
between January 2018 and July 2019. (Third Am. Compl. ¶¶ 296-99 & Exs.
R-S.) Those claims coincide with periods when ERMI allegedly did not have a
valid license to do business in Florida. However, there are no particularized
allegations to support that ERMI submitted false claims to the VA or the
OWCP outside those dates or to Medicare at any time. When it comes to
Medicare, the most Cooley can say is that from January 2018 to July 2019,

12

"ERMI presented claims for payment or approval to the United States for 16 weeks of DME usage for DME provided to Medicare patients in Florida." (*Id.* ¶ 300.) The factual basis for this allegation is a boilerplate summary of earlier allegations in the Third Amended Complaint. (*Id.*) Accordingly, the Florida Licensing Scheme survives Rule 9(b) only for those VA and OWCP claims identified between January 2018 and July 2019.

## B. Materiality of the Florida Licensing Lapses

The Court turns now to the Defendants' scheme-specific arguments for dismissal. Because the 16-Week Billing Scheme and the Concealment of Best Prices Scheme fail under Rule 9(b), the Court focuses its attention solely on the Florida Licensing Scheme.

First, the Defendants argue that the Third Amended Complaint fails to plead materiality with particularity. A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the government's payment decision to be actionable under the False Claims Act. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016). The statute defines "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). This definition focuses on "the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citation omitted). Although relevant, the mere fact that regulatory compliance is designated as a condition

13

of payment does not automatically make a misrepresentation material. *See id.* at 194. Materiality also cannot be found where noncompliance is "minor" or "insubstantial." *Id.*

According to the Defendants, there are no allegations in the Third Amended Complaint to support that the status of ERMI's Florida license was material to a federal payment decision. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 20.) They analogize the Florida licensing regime to the corporate business and medical licenses at issue in *United States ex rel. Taylor v. Boyko*, 39 F.4th 177 (4th Cir. 2022). (Reply Br. in Supp. of Defs.' Mot. to Dismiss, at 11-44.) There, the defendant's corporate charter and certificate of authorization for a medical corporation were rescinded in West Virginia after it failed to file an annual report and pay a $25 filing fee. *See Taylor*, 39 F.4th at 186. The defendant never reported the licensing lapse to the federal government, as required, and continued to bill Medicare for its services. *See id.* at 186-87. At the motion to dismiss stage, the district court held that this regulatory violation did not meet the False Claims Act's materiality standard. *See United States ex rel. Taylor v. Boyko*, 2020 WL 520933, at *5 (S.D. W. Va. Jan. 31, 2020). Specifically, "there [wer]e no allegations that [the defendant's] license status impacted the core medical services provided to patients and reimbursed by Medicare or the qualifications of the medical personnel providing care at [the medical center]." *Id.*

14

The Fourth Circuit agreed. It drew a firm distinction between revocations of personal medical licenses, on the one hand, and revocations of corporate certificates of authorization, on the other hand. *See Taylor*, 39 F.4th at 191.

> Personal medical licenses are issued to individual physicians or medical personnel, subject to the exacting strictures of state law. To obtain such a license, an individual generally must acquire a medical degree, complete years of residency or graduate clinical training, pass the Medical Licensing Examination, demonstrate "good moral character" and physical and mental fitness, and submit a complete application, including fees. [The defendant], in contrast, was issued a "[c]ertificate of authorization for [an] in-state medical corporation." To obtain such a certificate, a medical corporation must file an application, pay fees, and furnish proof that each shareholder is a licensed physician.

*Id.* (citations omitted). According to the Fourth Circuit, the lapse in the defendant's state licenses—due to its failure to file an annual report and pay a small fee—was a bureaucratic matter and not material to the provision of medical services. *See id.* at 194.

Although the Defendants rely heavily on *Taylor* to support dismissal, the Court finds that the decision in fact bolsters Cooley's case. Unlike in *Taylor*, Cooley's allegations suggest that the Florida licensing requirement was central to the medical services and equipment provided by ERMI and billed to the United States. Florida law requires that providers of home medical equipment obtain separate licenses for each of their premises. Fla. Stat. Ann. § 400.93(4). The licensing regime sets forth minimum standards to ensure that the medical equipment is safe and sanitary and that the personnel who manage,

15

administer, deliver, and maintain the equipment are qualified to do so. Fla. Stat. Ann. § 400.934; Fla. Admin. Code Ann. r. 59A-25.003 to .004. For example, all personnel must pass a level 2 background check, and delivery personnel must complete a training program covering all aspects of their jobs, including how to use each type of equipment being delivered. Fla Stat. Ann. § 400.953; Fla. Admin. Code Ann. r. 59A-25.004(3). Licensees must also be able to demonstrate a series of safety and infection control measures, such as storage of equipment to prevent dust accumulation, water damage, and vermin contact. Fla. Admin. Code Ann. r. 59A-25.003. The Florida Agency for Health Care Administration (the "AHCA") conducts facility inspections as part of the licensing process. Fla. Stat. Ann. § 400.933(1)(a).

In the Court's view, compliance with these licensing regulations (or lack thereof) is a factor that would likely affect a reasonable person's decision to pay for healthcare services. *See Escobar*, 579 U.S. at 193. Cooley alleges that even when ERMI held a Florida license, it misrepresented that all DME was stored, maintained, and shipped to patients from facilities in Atlanta, not Florida. (Third Am. Compl. ¶¶ 336, 339-41, 347, 355, 458, 460.) In reality, Cooley continues, ERMI operated from multiple locations in Florida, including garages and storage units, some of which were infested with rats and mold. (*Id.* ¶¶ 356, 458.) Cooley also alleges that ERMI concealed the identities of its Florida employees—particularly delivery personnel—for fear that they could not pass the mandated background check. (*Id.* ¶¶ 355, 468-69, 471.) These

16

misrepresentations and omissions go "to the very essence of the bargain[.]" *Taylor*, 39 F.4th at 190 (citation omitted). They raise significant concerns as to whether the DME supplied by ERMI was safe, sanitary, and effective for patients in Florida to use. *See United States ex rel. Escobar v. Universal Health Services, Inc.*, 842 F.3d 103, 111 (11th Cir. 2016) ("At the core of the MassHealth regulatory program in this area of medicine is the expectation that mental health services are to be performed by licensed professionals, not charlatans."). ERMI's alleged efforts to cover up its noncompliance further underscore that the Florida license was a material condition of payment. (Third Am. Compl. ¶¶ 328-29, 336-41.) *See United States v. Triple Canopy, Inc.*, 857 F.3d 174, 178 (4th Cir. 2017) (reaffirming, in light of *Escobar*, that the defendant's omissions were material based on "common sense" and its "own actions in covering up the noncompliance").

## C. Public Disclosure Doctrine

Next, the Defendants ask the Court to dismiss the Florida Licensing Scheme under the False Claims Act's public disclosure provision. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 22.) In relevant part, that provision bars a claim if substantially the same allegations were publicly disclosed in a federal criminal, civil, or administrative hearing in which the government or its agent is a party. 31 U.S.C. § 3730(e)(4)(A). There is an exception if the relator is an original source of the information. *Id.* The Eleventh Circuit has endorsed a three-part test for deciding if the public disclosure bar applies: (1) have the

17

allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information substantially the same as the plaintiff's suit; and (3) if yes, is the plaintiff an original source of that information. *See United States ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 812 (11th Cir. 2015) (citation omitted). An original source is someone who has "knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions." 31 U.S.C. § 3730(e)(4)(B).

As to the first prong, the Defendants argue that ERMI's licensing lapses were already litigated in Fulton County, Georgia, and in the Southern District of Florida. (Defs.' Br. in Supp. of Defs.' Mot. to Dismiss, at 22.) In the Fulton County complaint, filed on August 28, 2019, the plaintiff alleges that ERMI was not licensed by the AHCA at any time in the prior four years and that ERMI's failure to obtain a valid license constitutes a deceptive and unfair trade practice under Florida law. (*Id.*, Ex. A ¶¶ 1, 20-25.) In the Southern District of Florida complaint, filed on January 24, 2020, the plaintiff likewise accuses ERMI of violating the Florida Deceptive and Unfair Trade Practices Act based on the same licensing violation. (*Id.*, Ex. B ¶¶105-11.) Notably, the Fulton County case is irrelevant because under the 2010 amendments to the False Claims Act, only information disclosed in federal court proceedings are considered public disclosures. *See Osheroff v.*, 776 F.3d at 812.

In the Court's view, the Southern District of Florida complaint does not spell out the workings of the Florida Licensing Scheme as does the Third Amended Complaint. For example, whereas the earlier complaint states that ERMI held no Florida license in the last four years, the Third Amended Complaint identifies and attaches licenses that were issued to ERMI in October 2016 and November 2019. (Third Am. Compl. ¶¶ 321, 325.) The Third Amended Complaint also explains the basis for Cooley's allegation that those licenses were fraudulent—namely that ERMI failed to disclose its facilities and personnel in Florida to the ACHA. Further, unlike the plaintiffs in the Florida lawsuit, Cooley provides facts showing that ERMI's licensing lapses were knowing and not the result of innocent mistakes or simple negligence. (*Id.* ¶¶ 328-41, 350-57.) *See Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 ("Although proof of a specific intent to defraud is not required, the [False Claims Act's] language makes plain that liability does not attach to innocent mistakes or simple negligence." (quotation marks and citations omitted)). Accordingly, under the second and third prongs of the public disclosure test, the Court concludes that the information revealed in the Florida litigation is not substantially similar to Cooley's claims and that in any event, Cooley's allegations are protected by the original source doctrine.

### D. Branch's Individual Liability

The last issue raised in the motion to dismiss is whether Branch should be dismissed from this case in his individual capacity. (Defs.' Br. in Supp. of

19

Defs.' Mot. to Dismiss, at 23-24.) According to the Defendants, the Third Amended Complaint lumps ERMI and Branch together—more than 50 times by the Defendants' count—as though they are one in the same. (*Id.*) Branch, the Defendants emphasize, is simply the owner and CEO of ERMI; he is not himself a DME provider, nor does he personally seek payment from federal payors for ERMI's DME. (*Id.* at 24.) The Defendants also argue that Cooley's "alter ego" allegations do not provide a basis to pierce the corporate veil as to Branch. (*Id.* at 24-25.)

Citing 31 U.S.C. § 3729(a)(1)(A)-(B), Cooley argues that there should be no doubt that Branch *caused* false claims to be presented to the government. (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss, at 24.) In her response brief, she addresses only the 16-Week Billing Scheme and the Concealment of Best Prices Scheme, both of which have now been dismissed on separate grounds. (*Id.* at 24-25.) Meanwhile, the Third Amended Complaint makes only vague, conclusory allegations in an attempt to tie Branch to the Florida Licensing Scheme. For example, Cooley repeatedly references what "ERMI leadership" knew and did in response to ERMI's licensing lapses—in general, directing the company to continue operating illegally in Florida and providing false responses to an AHCA application. (Third Am. Compl. ¶¶ 331-36, 339-40, 354-55.) While Branch is a member of ERMI's leadership, there are no allegations about his own conduct sufficient to overcome the hurdle of Rule 9(b). The Third Amended Complaint's veil-piercing allegations also fail to

20

plausibly allege an alter ego theory of liability. (*Id.* ¶¶ 33-38.) Even if Branch owns and controls ERMI, the standard for Georgia's alter ego doctrine is whether the corporate form has been abused. *See Baillie Lumber Co. v. Thompson*, 279 Ga. 288, 289 (2005). The Third Amended Complaint does not meet that standard. (*E.g.*, Third Am. Compl. ¶ 38 (alleging, without any factual support, that Branch uses ERMI and its related entities to pay personal expenses).)

## IV.   Conclusion

For the foregoing reasons, the Defendants' Motion to Dismiss Third Amended Complaint [Doc. 62] is GRANTED in part and DENIED in part. Counts I through IV are dismissed as to all of the Defendants, and Counts V through VII are dismissed as to Defendant Thomas P. Branch.

SO ORDERED, this ___22nd___ day of May, 2023.

THOMAS W. THRASH, JR.
United States District Judge

21